IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| LT. PAT STOCKDALE and <br> LT. SHANE DUNNING, <br><br>      Plaintiffs <br><br> vs. <br><br> KIM HELPER, in her individual capacity, <br> and THE CITY OF FAIRVIEW, <br> TENNESSEE, <br><br>      Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> )   JURY DEMANDED <br> ) <br> ) <br> )   Case No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

---

## COMPLAINT

---

Come now, the Plaintiffs, by and through counsel, and for their cause of action against the Defendants would show unto the court as follows:

### PARTIES

1. Plaintiff Pat Stockdale is a resident and citizen of Williamson County, Tennessee. He is a former Lieutenant with the Fairview Police Department in Williamson County, Tennessee.

2. Plaintiff Shane Dunning is a resident and citizen of Dickson County, Tennessee. He is a former Lieutenant with the Fairview Police Department in Williamson County, Tennessee.

3. Defendant Kim Helper is the District Attorney for Williamson County, Tennessee. She is a citizen and resident of Williamson County, Tennessee.

4. The Defendant City of Fairview, Tennessee, is a municipality incorporated under the laws of the State of Tennessee, which entity is located in Williamson County, Tennessee.

## JURISDICTION AND VENUE

5.  This action is brought pursuant to 42 U.S.C. § 1983 seeking to redress a deprivation of the Plaintiffs' rights by the Defendants acting under color of law, which rights are secured by the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution, and rights guaranteed by the First Amendment to the U.S. Constitution.

6.  This complaint concerns the violations of civil rights, and this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

7.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

8.  All of the claims alleged herein arose in the Middle District of Tennessee, and Venue is therefore proper pursuant to 28 U.S.C. § 1391.

## ALLEGATIONS OF FACT

### *THE BACKGROUND*

9.  Plaintiffs are former Lieutenants for the Fairview Police Department. They were promoted to the position of Lieutenants in March of 2015, and had unblemished records.

10. In early 2015, Fairview Police officers began obtaining secondary employment with Apex Security Group, which had a contract to perform security services around the Metro Nashville Area, including Nissan Stadium. Apex was owned or managed by Fairview Auxiliary Police Officer Ronnie Williams.

11. Fairview Police officers also obtained secondary employment with Uniform Protective Services, which was owned or managed by Fairview Auxiliary Police Officer Billy Gross.

12. Lt. Stockdale opposed the relationship, because it created a conflict of interest with staff assignments at Apex. On security assignments, ranking Fairview officers, including the

Chief, Assistant Chief, Lieutenants and Sergeants, were reporting to inferior, auxiliary officers Ronnie Williams and Billy Gross.

13. The relationship degraded the chain of command. Plaintiff Stockdale heard Billy Gross openly state to several officers that he only answered to the Chief, even though he was outranked by corporals, sergeants, and lieutenants.

14. Chief Harris and Asst. Chief Sutton allowed Williams and Gross to do as they pleased at the Fairview PD. Many officers resented the *quid pro quo* relationship between Williams, Gross and the Fairview PD.

15. The relationship created an appearance of impropriety, which eroded department morale. In return for staffing Fairview PD officers at security jobs, Ronnie Williams was promoted directly from an auxiliary officer to a full-time detective. All job openings were supposed to be posted internally, with a competitive bidding process to follow. To the ire of numerous Fairview Police Officers, Williams was immediately promoted from auxiliary officer to a full-time detective by Chief Harris and Asst. Chief Sutton, even though Williams lacked experience as a detective.

16. The relationship was detrimental to the citizens of the City of Fairview. Because of the small size of the Fairview PD, when Fairview officers were engaged in secondary employment at Nissan Stadium during the Titans games, up to half of the entire force could be providing security. In the event of an emergency, the City of Fairview would be unable to immediately call in the Fairview officers that were away from the City providing private security services.

17. On February 1, 2016, the first day that Mr. Williams was a full-time officer for Fairview PD, he was arrested during a prostitution sting in Davidson County for solicitation of a prostitute.

18. Lt. Stockdale was the Communications Officer at Fairview PD, and was assigned with handling any press inquiries. He was given a prepared statement from Wayne Hall, the City Manager during that time.

19. On February 3, 2016, Stockdale was contacted by the media, and he delivered the statement as written. Assistant Chief Mark Sutton gestured for Stockdale to cut off the phone call. Sutton then called Chief Terry Harris, and sent the City Manager a text message. Sutton then called auxiliary officer Billy Gross.

20. Because auxiliary officers are not involved in the day-to-day operations or the decision-making process of the Fairview Police Department, Stockdale asked Sutton why he was pandering to an auxiliary officer during the crisis.

21. Asst. Chief Sutton became livid and went on a tirade. He yelled at Stockdale, "you better get on board!" He again yelled, "Get on board or you will not draw another f**king check from the City of Fairview!"

22. During the tirade, Sutton was so loud that other officers had to end their phone calls. Many believed that a physical altercation was about to take place and left their offices to intervene.

23. Stockdale attempted to leave his office to brief the City Manager on the situation. Sutton yelled, "You are not going f**king anywhere!" Stockdale was able to get around Sutton and headed into Lt. Dunning's office, while being pursued by Sutton.

24. Lt. Stockdale told Sutton that he was a dirty cop, and Sutton yelled, "You don't know who you are f\*\*king messing with!" Lt. Stockdale attempted to exit Lt. Dunning's office, and other Fairview police officers had to physically restrain Sutton.

25. As Stockdale went upstairs to report to the City Manager, Sutton yelled, "Do you really want to end your career by going upstairs?!" He reiterated that Stockdale would never draw another check from the City of Fairview if he went to the City Manager to report the situation.

26. On February 5, 2016, Wayne Hall suspended Chief Harris and Asst. Chief Mark Sutton from active duty. Billy Gross resigned "for personal reasons." The City appointed an Interim Police Chief, Travis O'Neal.

27. The same day, Lt. Stockdale was informed that Fairview Police officer Ronnie Connor had been back-dating secondary employment forms. Connor wrote a statement admitting that he knew his actions were wrong, but that he had been ordered by the Chief to do so.

28. Stockdale and Interim Police Chief Travis O'Neal recommended that Wayne Hall place Connor on administrative leave, and Hall did so. Mr. Hall instructed Stockdale to document Hall's suspension of Connor, which was placed in Connor's personnel file.

29. Lt. Stockdale sent text messages to Defendant Helper, seeking guidance as to whether or not Connor's actions were illegal. A copy of the text messages is attached to this Complaint as **Exhibit 1**.

30. The week after Billy Gross resigned, Lt. Stockdale and Lt. Dunning discovered that Fairview auxiliary offers were provided false credentials that indicated that they were full-time police officers. Lt. Dunning and Lt. Stockdale immediately reported to former City

Manager Wayne Hall that Gross and Williams had been carrying false credentials for some time.

31. Asst. Chief Mark Sutton was responsible for issuing the credentials and uniforms to Gross and Williams.

32. In a recorded conversation, Mr. Hall confirmed that Terry Harris and Mark Sutton had lied to him about Ronnie Williams. Mr. Hall confirmed his belief that falsifying government IDs was illegal.

33. Carrying false credentials and allowing part-time auxiliary officers to wear a police uniform is illegal. In order to wear the Fairview Police uniform while engaged in secondary employment, an officer must be a full-time police officer.

34. T.C.A. § 62-35-141(a) places requirements on full-time police officers who are working as security guards outside of their primary jurisdiction. They are required, *inter alia*, to notify the chief law enforcement officer of the jurisdiction in which they are providing uniformed security of the location of their assignment. Full-time police officers may wear the uniform of their primary jurisdiction. A person who is not a full-time police officer is required to possess a license through the Department of Commerce and Insurance, and they are forbidden from wearing police uniforms. Pursuant to T.C.A. § 62-35-136, violations of the rules and regulations constitute Class A misdemeanors.

35. Neither Billy Gross nor Ronnie Williams were full-time police officers during the time that they had been wearing Fairview police uniforms and employed as security guards within Metro Nashville.

36. Lt. Dunning and Lt. Stockdale reports of impropriety and misprision occurring within the City of Fairview were ignored.

37. The City of Fairview, the Williamson County Sheriff's Office, and the Defendant Helper were dismissive of these obvious attempts to defraud Metro Police Chief Steve Anderson and his staff. This conduct held the City and its police department to disrepute. The District Attorney and City Officials were presented with concrete evidence of an attempt to deceive in order to earn money to which they were not entitled.

### GENERAL HELPER'S INVOLVEMENT

38. As the allegations of this Complaint will demonstrate, Gen. Helper's unseemly conduct was a product of the arrogance of power. Based upon personal motivations unrelated to any duty of her office, and a desire to intervene in the business of a municipality in which she had no authority of any kind, the Defendant Helper intentionally and maliciously ruined the distinguished careers of two senior officers of the Fairview Police Department, against whom there were no complaints of wrongdoing of any kind.

39. On February 16, 2016, Chief Terry Harris announced his retirement while he was on suspension.

40. On February 16, 2016, Defendant Helper sent a text message to her Assistant District Attorney, Sean Duddy, a copy is attached hereto as **Exhibit 2**. The following exchange took place:

   a. Gen. Helper: "Is Joey [Kimball] interested in the [Fairview Police Department] job? I think they need the kind of leadership that suits his strong skills.
   b. Sean Duddy: "I whole heartily [sic] agree."
   c. Gen. Helper: I will advocate for him if he is interested. God help us if it's dunning or Stockdale."
   d. Sean Duddy: "That could be worse than Sanders or Clinton as the next president."
   e. Gen. Helper: "Amen!"

41. On February 16, 2016, Defendant Helper engaged in further text messaging with Barry Carroll, a Special Agent for the 21st District Attorney General. A copy is attached as

**Exhibit 3**.  Mr. Carroll had reported to Defendant Helper that the media had inquired about whether or not the Tennessee Bureau of Investigation or the DA's office was involved in any investigation concerning the Fairview Police Department.  Helper, referring to the news reporter, states:

> Helper:  "No problem.  I told him neither your agency nor mine were involved in a formal criminal investigation.  He is being fed a lot of crisp from the two wannabe Chiefs.  Thx for the heads up"
>
> Mr. Carroll replied: "I figured as much.  I can't imagine [Stockdale] or Dunning either one being cops much less Chiefs."

42. On February 19, 2016, former City Manager Wayne Hall provided Asst. Chief Mark Sutton with his Notice of Intended Dismissal based on seven different violations of City Policies and City Ordinances.  A copy of the Notice is attached hereto as **Exhibit 4**.

43. On February 29, 2016, the Fairview Board of Commissioners held a secret meeting and deliberated for four (4) hours, in violation of the Open Meetings Act.  The City Attorney was not present, and no minutes were taken.  During the illegal meeting, as Wayne Hall acknowledged in a recorded conversation, the Board decided to bring back Chief Terry Harris, rescind Asst. Chief Sutton's Notice of Intended Dismissal, and place Sutton on administrative leave with pay.  Mr. Hall stated that he was opposed to the Board's decision.

44. Members of the Board called former Chief Harris, who agreed to return, on condition that the Board would not investigate him any further, and Lt. Dunning and Lt. Stockdale were placed on administrative leave.  The Board and Chief Harris agreed that the Williamson County Sheriff's Office ("WCSO") would conduct an investigation into any criminal conduct on the part of the Plaintiffs.

45. Asst. Chief Sutton's father, former Fairview Vice Mayor Toney Sutton, was present at the illegal meeting despite the actual conflict of interest with his son being a target of the

WCSO investigation. Toney Sutton is also a sergeant for the Williamson County Sheriff's Office.

46. In furtherance of the agreement reached by the Board during the illegal meeting of February 29, 2016, Chief Harris was not interviewed during the WCSO investigation.

47. In a text message between Defendant Helper and Sean Duddy, Helper acknowledges that she spoke with Sheriff Jeff Long on February 29, 2016, the day of the illegal meeting of the Fairview Board of Commissioners. A copy of the text message is attached as **Exhibit 5.** Defendant Helper states that she was aware that "there were some new issues that came up" with former Chief Harris returning to work, and Plaintiffs being placed on administrative leave. Upon information and belief, Defendant Helper participated in the illegal Board meeting of February 29, 2016 by telephone.

48. Commissioner Shannon Crutcher confirmed during a televised BOC meeting that the Board had voted during the illegal Board meeting of February 29, 2016.

49. On March 1, 2016, Wayne Hall presented Lt. Dunning and Lt. Stockdale with a notice that they were being placed on administrative leave. They were stripped of their gun, badge, and credentials. They were never provided any notice of the charges against them, in violation of Fairview City Policy. After handing Plaintiffs the letter, Mr. Hall stated, "I didn't have anything to do with this," even though the City Charter required Hall to make employment decisions, including suspension, demotion or dismissal.

50. Plaintiffs vehicles were reassigned, despite having a fleet of new vehicles. The Department reassigned their offices and refused to allow the Plaintiffs access to their personal effects. The Department relocated the Plaintiffs' mailbox to indicate that they were no longer Lieutenants. They were excluded from the insurance meeting for Fairview PD officers.

51. Even though the Plaintiffs were not the individuals involved in the Apex security issues, the Plaintiffs were falsely informed that they were placed on administrative leave with pay to "insure the integrity of the investigation" of the police department. If the statement were true, Chief Harris and Ronnie Connor should have remained on administrative leave until the conclusion of the WCSO investigation.

52. The City's stated reason for placing Plaintiffs on administrative leave was a pretext for an unlawful retaliatory motive.

53. On March 4, 2016, Mr. Hall sent Asst. Chief Sutton a notice that the City was withdrawing the charges against him. The disciplinary files for Asst. Chief Sutton were purged, including previous disciplinary actions taken against him.

54. Members of the Board of Commissioners falsely stated that they had no active involvement in the WCSO investigation.

55. In the March 1, 2016 text messages attached as Exhibit E, Defendant Helper states that the Sheriff was "waiting on documentation." In a letter to Sheriff Jeff Long dated March 1, 2016, a copy of which is attached as **Exhibit 6**, Commissioner Crutcher stated, on behalf of the Board:

"Dear Sheriff Long,

It was a pleasure speaking with you yesterday in regard to the situation surrounding the Fairview Police Department ("FPD"). As we discussed in the conference call, the City Manager has been conducting an internal investigation centered around the FPD's hiring of Ronnie Williams ("Mr. Williams") and the events which occurred subsequent to his arrest for patronizing prostitution on February 1, 2016. However, due to recent allegations and in light of the cliquish relationships existing within the FPD, it is apparent the integrity of the internal investigation has been compromised. As such, the City verily believes an outside agency should intervene. The City is grateful for your willingness to extend the resources of the Williamson County Sheriff's Department ("WCSD") to assist in this endeavor.

Let me preface the remainder of this letter by acknowledging that neither the Board of Commissioners nor the City Manager believe anything· criminal has occurred with respect to the hiring of Mr. Williams. As such, from a public relations standpoint, we respectfully ask the investigation not initially be characterized as a criminal investigation. However, if during the course of the investigation, WCSD finds criminality, then clearly our position will change. In fact, it is probable allegations of criminal conduct will be made by various members of the FPD. The City does believe the FPD has operated for quite some time in a less than stable environment. Individuals within the FPD have attempted to intimidate other members of the FPD and sitting Commissioners in retaliation for actions taken in their official capacities.

The City envisions WCSD acting as the neutral, objective fact-finder in this process. As I understand it, there is documentary evidence and video/audio evidence that will need to be reviewed. We would suggest that each member of the FPD be interviewed individually and preferably at WCSD. the City asks that each interview be recorded and will gladly pay any expense associated therewith. We hope the interviews can be structured where it gives all members of the FPD an opportunity to address all grievances or report observations of any illegal or unethical conduct without risk of reprisal. Further, out of an abundance of caution, we suggest the individual(s) conducting the interviews have no ties to the City of Fairview or any member of the FPD. ·

We are confident WCSD's role in this investigation will not in any way jeopardize the City's commitment or the FPD's resolve to provide assistance to WCSD in accordance with the existing interlocal agreement. WCSD will not be the arbiter in this matter. The City will take the information gathered and use said information to form an opinion as to if and who may have acted or failed to act in a manner contrary to the high ethical standards expected of law enforcement officers in this state.

In light of the significant amount of information to be shared, I suggest once you have identified who will conduct the interviews a meeting be scheduled with the Board of Commissioners, City Manager, and City Attorney in order to provide additional pertinent information. In closing, I would like to repeat how appreciative we are for your willingness to help in this difficult situation.


With kindest regards, I remain,

Very truly yours,

Shannon L. Crutcher

cc: Wayne Hall
Allen Bissell
Patti Carrol
Stuart Johnson ·
Toney Sutton

56. Mr. Crutcher's Letter to Sheriff Long is part of the scheme or artifice employed by the Defendants to create a pretext for the Plaintiffs' terminations and to hide the actions and involvement of the Fairview Board of Commissioners. The letter acknowledges that the Board spoke with the Sheriff on February 29, 2016 in a conference call, which took place during the illegal meeting. As evidenced by Defendant Helper's communications, the investigation was criminal in nature from the outset and Plaintiffs were the intended targets, in clear retaliation for their reports of misconduct and to facilitate their unlawful termination.

57. During interviews of Fairview police officers, the WCSO investigators did not have any specific questions except in regards to Lt. Dunning and Lt. Stockdale. At the direction of Terry Harris, Toney Sutton, and Defendant Helper, the Plaintiffs were the focus of the investigation, in clear retaliation for whistleblowing.

58. In April 2016, before the completion of the WCSO investigation, former Chief Harris informed Fairview employees that he would, at a minimum, demote Plaintiffs from Lieutenants to patrol officers.

59. On or about May 18, 2016, Wayne Hall stated that Mayor Patti Carroll informed him that Joey Kimball was already hired as the interim Chief of Police by Commissioner Shannon Crutcher. Defendant Helper had previously stated that she would advocate for Mr. Kimball to be the Fairview Police Chief. Upon information and belief, the Defendant Helper communicated directly to the Mayor and the Fairview Board of Commissioners during her actions to have Mr. Kimball hired as the Fairview Police Chief.

60. On or about May 18, 2016, Chief Harris stated that he met with Sheriff Long to discuss the parameters of the WCSO investigation. Harris is acquainted with Sheriff Long and he encouraged the Sheriff to turn the WCSO investigation into a criminal investigation.

61. On May 18, 2016, Defendant Helper, Det. Sanders, Det. Sheldon, and Captain Beard of the WCSO met to discuss the investigation.

62. Vice Mayor Toney Sutton was also a Sergeant employed by the WCSO. There was an inherent conflict of interest because Toney Sutton's son, Mark Sutton, was purportedly a subject of the WCSO investigation. Toney Sutton participated in the WCSO investigation despite his statements to the contrary. In recorded conversations, Toney Sutton discussed the investigation with a Fairview employee, stating, *inter alia*, the following:

    a. "I'm telling you right now, you're going to be short two people in a week."
    b. Referring to the Plaintiffs' report of improper and illegal conduct, Sutton stated, "You can't play a department like that, because you'll do it again if you need to."
    c. "Somebody was ready to say, 'Let's just bring them all back.' It ain't going to happen. It's not going to happen."
    d. Referring to the assistant chief's position, Sutton says, "It ain't going to be no assistant chief. Not for a little bit. It's in place."
    e. When asked if anyone will be able to see the WCSO report, Sutton replies, "I am. I imagine most of the board will."

63. The Fairview BOC took numerous actions to terminate Plaintiffs without any notice or a hearing. The Board submitted two separate budgets, one which included Plaintiffs, and one which did not.

64. In June 2016, Commissioner Crutcher discussed the Plaintiffs' reports to the media and he inferred his involvement in the "politics involved in the day-to-day operations" of the Fairview PD. Crutcher stated, *inter alia*, the following:

"I am impatient too; however, if they would have let this thing play out without all the surreptitious recording, reaching out to the media and otherwise, then I am confident they would have been cleared and back to work. Now this has turned into so much more from a policy standpoint. I would go to work, do my job and then go home to my family. The

politics involved in the day-to-day operations of the city, particularly within the PD, is ridiculous."

A copy of Crutcher's text message is attached hereto as **Exhibit 7**.

65. On June 3, 2016, Det. Tameka Sanders sent a text message to Defendant Helper, a copy of which is attached as **Exhibit 8**. The parties discussed a recording made by Plaintiff Stockdale. Det. Sanders informs Defendant Helper: "We found out info yesterday that changes things for me." Although the text message was sent out of order, Det. Sanders states:

> "I believe Stockdale but I don't know. They are a mess over there. We're going to try to interview a guy [Monday] but he wouldn't commit to me. He said it will depend on whether or not his hay is cut. Yesterday we found info that leads me to believe Hamilton has not been completely honest. Right now I don't feel good about this being criminal."

66. At 11:05 pm on June 4, 2016, Det. Sanders sent a text to Defendant Helper stating, "I can't imagine what it will be like if they're able to return." A copy of the text is attached as **Exhibit 9**.

67. Despite Det. Sanders' opinion that one of the witnesses had lied during the WCSO investigation and that she did not feel that the Plaintiffs had engaged in any criminal activity, Defendant Helper kept the investigation going for almost two more months, desperately trying to find some misconduct that would implicate the Plaintiffs in criminal activity in order to facilitate their termination.

68. On June 8, 2016, Detective Sanders and Defendant Helper discuss a meeting with the Sheriff. A copy of the text messages is included in **Exhibit 9**. Defendant Helper expresses that she was uncomfortable attending the meeting with the Sheriff because of "all the press" and the Facebook postings of a Fairview police officer. Defendant Helper's unwillingness to attend a meeting with the Sheriff indicates that the meeting involved people who should

not have had any involvement in the WCSO investigation, including members of the Board of Commissioners, Terry Harris, and/or Mark Sutton.

69. Former City Manager Wayne Hall stated in a recording, "Pat [Stockdale] has been cleared. So as soon as we get the official word from the Sheriff, he can come back." Hall acknowledged that nobody had investigated Chief Harris. Hall was asked, "How do you investigate anything and you don't talk to the suspect?" to which Hall replied, "That's what I'd like to know, and I don't understand that either."

70. Both Plaintiffs and the public were lead to believe that the WCSO investigation was conducted by the Sheriff's office to look into the allegations about policy violations within the Fairview PD, the relationship between the Fairview PD and Apex & UPS security companies, including back-dating documents and allowing auxiliary officers to wear police uniforms.

71. The WCSO investigative report was released on July 20, 2016. There was no finding of criminal wrongdoing by the Plaintiffs.

72. The report concludes, "All facts of this investigation have been shared with District Attorney Kim Helper. She has determined that there is no evidence to support the prosecution of any party. The case is closed."

73. Despite no finding of criminal conduct, the report is intentionally biased against Plaintiffs. During the investigation, various officers reported wrongdoing on the part of Mark Sutton and Ronnie Connor. The allegations were intentionally omitted from the report. Other officers reported information favorable to the Plaintiffs, which was intentionally omitted from the report. Plaintiffs subsequently learned that Sgt. Connor and others had coerced and threatened other officers into making false statements to the WCSO investigators.

74. Commissioner Crutcher took action to suspend the Fairview Policy and Procedures manual in order to eliminate Plaintiffs' due process rights and terminate them. The item was placed on the July 21, 2016 Board Agenda.

75. The Board of Commissioners told the City Attorney that they wanted the Plaintiffs terminated, and that he was to find a way to do it. The City Attorney informed the Board that he did not believe there was any basis for terminating the Plaintiffs.

76. Undeterred, the City served notices of intended dismissal to Plaintiffs. Lt. Stockdale was being terminated for placing Ronnie Connor on suspension without the authority to do so, which is false. In fact, the decision to suspend Connor was made by City Manager Wayne Hall.

77. Lt. Dunning would be terminated for purportedly using foul language and threatening a criminal informant. The allegation is false for several reasons. Det. Jennifer Whittaker stated that she was supervising this criminal informant, when in fact it was assigned to Sgt. Joe Cox. There was no threat to the informant to make three drug arrests or their probation would be revoked. The informant had already made at least one drug purchase. The informant was on probation and had a new charge. Lt. Dunning called the informant's probation officer according to protocol, and stated that the informant was cooperating with a police investigation and that Lt. Dunning recommended leniency on her first court appearance.

### *PLAINTIFFS PRIOR LAWSUIT AGAINST THE CITY OF FAIRVIEW*

78. On July 21, 2016, Plaintiffs Stockdale and Dunning filed a complaint in the United States District Court for the Middle District of Tennessee, *Stockdale et al. v. The City of Fairview,*

*et al.,* Case No. 3:16-cv-01945. A copy of the complaint is attached hereto as **Exhibit 10**. The facts of this case are incorporated herein by reference.

79. Plaintiffs alleged ten (10) counts against the City of Fairview and individual members of the Fairview Board of Commissioners for, *inter alia*, violation of their rights to due process, violation of their First Amendment right to freedom of speech, conspiracy to deprive them of their constitutional rights, and state law claims of violation of the Public Employee Protection Act, Negligence *per se* violation of T.C.A. § 39-16-403, and defamation.

80. The District Court, Chief Judge Kevin Sharp presiding, found that Plaintiffs' case had a likelihood of success on the merits and entered a temporary restraining order prohibiting the City of Fairview and its agents from retaliating against Plaintiffs by terminating their employment, eliminating their positions, hiring or promoting individuals to their positions, or demoting plaintiffs or otherwise eliminating their pay. Case No. 3:16-cv-01945, Dkt. No. 7. A copy is attached hereto as **Exhibit 11**.

81. In August of 2016, Scott Collins became the City Manager for Fairview, replacing Wayne Hall, who had appointed himself in charge of the Fairview Codes Department.

82. The case was mediated and settled. The parties stipulated to the dismissal of the case with prejudice. [Case No. 3:16-cv-01945, Dkt. No. 25].

83. Pursuant to the Settlement Agreement, the Plaintiffs were returned to active duty with the City of Fairview Police Department on September 1, 2016. Since their return, Plaintiffs had been carrying out their duties to the satisfaction of the City of Fairview. No citizen had filed any complaint about the Plaintiffs. At no point were Plaintiffs disciplined in any manner or otherwise counseled for inadequate job performance.

### DEFENDANT KIM HELPER'S UNLAWFUL ACTIONS
### TO PROCURE PLAINTIFFS' TERMINATION

84. On or about October 12, 2016, the Fairview City Manager, Scott Collins, implemented his plan to "re-structure" the Fairview PD. Mark Sutton was given a position as the "Department Administrative Officer," which returned him to being second in command of the Fairview Police Department. The job was not announced within the department, in violation of Fairview City Policy.

85. On October 25, 2016, Scott Collins informed the Plaintiffs, through counsel, that District Attorney Kim Helper had contacted him on the phone on October 18, 2016, stating that she was dissatisfied with Collins decision to restructure the Fairview Police Department. Gen. Helper told Mr. Collins that she wanted him to carry out the restructure and assignments of police officers according to her preferences.

86. Mr. Collins has claimed that he informed Defendant Helper that the operation, structure, and assignment of officers was solely his decision to make, not hers, and that his conversation with Defendant Helper involved a heated argument on October 18, 2016. Mr. Collins stated that Gen. Helper had threatened him during their conversation, stating that she would not staff the Fairview City Court with prosecutors unless she had control over Fairview Police Officer staff assignments.

87. The conversation of October 18, 2016 focused on removing Lt. Dunning and Lt. Stockdale from the Fairview Police Department.

88. Scott Collins presented to Plaintiffs, through counsel, an email dated October 19, 2016, a copy of which is attached as **Exhibit 12.** The email reads:

    Subject: Fairview personnel concerns

    Mrs. Helper,

As we discussed yesterday, I understand that you have some concerns regarding some members of our police department staff. If you can provide me with those concerns or directives, it will assist me with the reorganization of the department.

Respectfully,

Scott Collins

89. On October 20, 2016, Defendant Helper responded to Mr. Collins' email. A copy of which is included in **Exhibit 12**. The email reads:

> Mr. Collins, per our discussion, this Office has concerns about reports initiated/investigated solely by Officers Shane Dunning or Pat Stockdale. Because of the information contained in the Williamson County Sheriff's Department Investigative report, we will be required to turn that report over to defense counsel in cases where Officers Dunning and/or Stockdale are involved. Without independent corroboration from another law enforcement officer and/or independent witness, the testimony of Officers Dunning and/or Stockdale may be impeached, thus creating challenges for the State in proving its case beyond a reasonable doubt. (Giglio v. United States, 405 U.S. 150 (1972)).

90. Gen. Helper's reference to the *Giglio v. U.S.* decision is commonly known as a "*Giglio* impairment," which is unique to members of the law enforcement community who frequently testify as witnesses for the State. The finding denotes that a police officer's testimony is not credible because they have committed perjury, made inconsistent statements that are material to a pending criminal prosecution, or have otherwise committed an act of dishonesty that is admissible to impeach their testimony pursuant to the Tennessee Rules of Evidence.

91. A *Giglio* impairment will effectively eliminate a police officer's ability to testify in court during the prosecution of an individual that they have arrested.

92. A *Giglio* impairment will not only result in a police officer's termination, the finding renders a police officer incapable of obtaining employment in another police department. A *Giglio* impairment is a career-ending condition for any police officer.

93. Defendant Helper's decision to *Giglio* impair the Plaintiffs was purportedly based on an "investigative report" from the Williamson County Sheriff's Office ("WCSO") that was released on July 20, 2016. Although Lt. Mark Sutton and Officer Ronnie Connor were also mentioned in the same report and accusations of wrongdoing were made against them, Defendant Helper did not even mention their names.

94. Defendant Helper was well aware that Detective Jennifer Beach-Whitaker was criticized by one of Helper's Assistant District Attorneys for giving false testimony during a hearing in May of 2015, yet the detective's name is not even mentioned. The Defendant Helper was present during the hearing. Following the hearing, Det. Beach-Whitaker said that she had "misremembered" what had occurred. Defendant Helper's Assistant DA, Jessica Borne, said, "No, Jennifer, you lied. You have hurt the credibility of the police department and I don't know if we can ever present anything you say to the Court again."

95. Defendant Helper's statements directly contradict the WCSO report, in which she found no evidence of criminal conduct.

96. None of the unsubstantiated and unfounded allegations in the WCSO report were the result of any contemporaneous report by any purported victim. It failed entirely to contain the Plaintiffs' account of the allegations levied against them. The Plaintiffs were never provided with any notice of any charges or informed of the allegations against them.

97. The WCSO report fails to identify any of the "employees" that were interviewed. The Plaintiffs were falsely informed that they were placed on Administrative leave in order to preserve the integrity of the investigation. The Plaintiffs were falsely informed that the focus of the investigation was the allegations of impropriety between the Fairview Police Department and the APEX and UPS security firms. At the direction of Defendant Helper,

the WCSO investigation focused on whether the whistleblower Plaintiffs had committed any crimes at any time prior to their being placed on administrative leave.

98. Scott Collins claimed that he informed Defendant Helper that he did not believe that Plaintiffs' situation would implicate a finding of *Giglio* impairment. Prior to any notice of termination being sent out, Mr. Collins met with his counsel. He reviewed the *Giglio* decision, and both concluded that there was no basis for any *Giglio* impairment of Lieutenants Stockdale or Dunning.

### THE WCSO INVESTIGATION IS INADMISSIBLE AND DOES NOT IMPLICATE *GIGLIO.*

99. On October 31, 2016, Defendant Helper was informed that her determination that Plaintiffs were *Giglio* impaired was factually and legally incorrect. Defendant Helper refused to change her position, stating in words or substance that even if she were incorrect, she had "other reasons" motivating her removal of the Plaintiffs from their employment.

100. Counsel for Plaintiffs asked to meet with Defendant Helper, which she specifically declined to do.

101. Defendant Helper is a licensed attorney and has been the Williamson County District Attorney since 2008.

102. Pursuant to Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.1, Defendant Helper is required to possess the legal knowledge and skill necessary for an attorney in her position. She is required to possess the knowledge of the Tennessee Rules of Evidence, the significance of *Giglio* in the context of law enforcement officers, and its application to their profession.

103. Pursuant to Tennessee Supreme Court Rule, Rule of Professional Conduct 4.1, Defendant Helper is precluded from using means that have no substantial purpose other

than to embarrass, delay, or burden a third person, or to knowingly use methods of obtaining or using evidence that violate the legal rights of any person.

104.    Defendant Helper knew that she had no basis in law or fact to decline to prosecute any case involving the Plaintiffs pursuant to *Giglio*.  Defendant Helper is fully aware that the WCSO report and any allegations contained therein are not "evidence" and are entirely inadmissible in any competent judicial proceeding in the State of Tennessee.  Because the WCSO report had already been published on the Defendant Fairview's website, the Defendant Helper was well aware that she would not have to "hand over" the WCSO report to any criminal defense attorney.

105.    Defendant Helper's *Giglio* comment was not made in pursuit of any pending case.

106.    Defendant Helper's false *Giglio* impairment – and Scott Collins' complicity in terminating Plaintiffs because of it – is a transparent attempt to circumvent the terms of the Settlement Agreement between the Plaintiffs and the City of Fairview, as well as the established procedural protections in the Fairview police disciplinary system, and unlawfully terminate Plaintiffs in retaliation for their report of misconduct within the City of Fairview.   The Defendants' stated reasons for terminating Plaintiffs are a pretext for an unlawful and retaliatory motive.

107.    Mr. Collins' statements regarding his "argument" with Defendant Helper over staffing decisions is implausible.  Mr. Collins had sent a prior email on October 18, 2016, which thanked Defendant Helper her for the guidance that she provided.  A copy is attached as **Exhibit 13**.  The email reads:

    Subject:  Contact Information

    Mrs. Helper,

Thank you so much for your time and input today. This email is my office email and my cell phone number is 205-XXX-XXXX [Redacted]. I look forward to working with you and taking any guidance you are willing to provide.
Have a great evening!

Scott Collins

108.     Prior to her conversation with Collins, Defendant Kim Helper sent a text message to the Mayor of Fairview, Patti Carroll, a defendant in the Plaintiffs prior lawsuit who was actively involved in the conspiracy to unlawfully terminate Plaintiffs. A copy is attached as **Exhibit 14**. Defendant Helper states:

> *"Hi mayor. Its Kim Helper can you let me know when s good time would be to chat about some of the changes in the police department. I have some major concerns"*

Mayor Patti Carroll responds:
*"I am available now, if you would like to give me a call or if you are looking to set up a time to meet just let me know what's best for you."*

109.     Neither the Mayor nor any member of the Board of Commissioners has the authority to make employment decisions. Section 6-21-108(2) of the Fairview City Charter authorizes the City Manager to appoint, promote, demote, suspend, transfer, remove, and otherwise discipline all employees. There is no provision of law that enables Defendant Helper or any District Attorney to influence these decisions.

110.     Plaintiffs were nonetheless served notices of intended dismissal, the sole reason being Defendant Helper's email. Defendant Helper's email was quoted *verbatim* in the Plaintiffs' Notice of Intended Dismissal. The Plaintiffs were not accused of any First Group Offenses, Second Group Offenses, or Third Group Offenses that would warrant their suspension, demotion or dismissal in accordance with the Fairview Employee Handbook.

111.     Prior to the Pre-Dismissal Hearing, on November 4, 2016, Mr. Collins published the following statement to the news media:

"Lieutenant Stockdale's placement on administrative leave and intended dismissal results from a communication to me from District Attorney General Kim Helper. The effective result of that communication is that Lieutenant Stockdale's ability to function as police officer has been nullified."

Collins stated that the same was true for Lt. Dunning.

112. Prior to the Plaintiffs' pre-termination hearing, they were served with their final paychecks and received notices that they were eligible for COBRA insurance. Pursuant to Section H of the City of Fairview Employee Handbook, "All terminal pay shall be paid at the employee's regular rate of pay at the time of termination from the City."

113. Plaintiffs were therefore terminated prior to Mr. Collins hearing any of Plaintiffs' rebuttal evidence at the Pre-Dismissal Hearing.

114. On November 9, 2016, Mr. Collins sent all Fairview Police Officers home for 48 hours, with exception of Interim Chief Scott Smith and Lt. Mark Sutton, who has been returned to his position as second in command of the Fairview PD. Lt. Mark Sutton was thereafter returned to the office he formerly held as Assistant Chief of Fairview PD.

115. On December 6, 2016, the Plaintiffs attended their Pre-Dismissal hearing. The sole reason for their termination was the email of Defendant Helper. Mr. Collins stated that, in the absence of the email from General Helper, the Plaintiffs would not have been terminated. It was explained at length during the hearing that there was no basis whatsoever to find a *Giglio* impairment.

116. A copy of the transcript from the Pre-Dismissal Hearing is attached hereto as **Exhibit 15**. Mr. Collins claimed, *inter alia*, that he accepted her email at face value and used it as the sole reason for terminating Plaintiffs.

117. Mr. Collins did not resist Defendant Helper's decision in either an informal or formal manner. He did not speak with Interim Police Chief Scott Smith prior to his

determination. Defendant Helper did not submit the WCSO report to any judge for an *in camera* hearing to determine its admissibility. No competent judge would have found the WCSO report to be admissible to impeach the Plaintiffs under any circumstance.

### DEFENDANT HELPER IS NOT ENTITLED TO IMMUNITY FOR HER CONDUCT

118. Defendant Helper is entitled to absolute immunity for actions taken during the prosecution of criminal cases within the scope of her position as a District Attorney. However, Defendant Helper has no statutory or common law right to influence employment decisions within the City of Fairview, Tennessee.

119. Defendant Helper was not preparing for the prosecution of any pending judicial proceeding involving Plaintiffs as state witnesses, and was therefore not, at the time of her email to Mr. Collins, evaluating any evidence in her capacity as a prosecutor.

120. Defendant Helper has no right to destroy the careers of police officers by false allegations of *Giglio* impairment.

121. Defendant Helper knew that the import of her statements and express citation to *Giglio v. U.S.* would cause the termination of Plaintiffs' employment, and would forever preclude them from seeking employment as police officers in any jurisdiction in the United States.

122. At no point during the WCSO Investigation did Defendant Helper interview or otherwise question the Plaintiffs about the unfounded allegations contained therein.

123. Defendant Helper therefore has no reasonable basis to even question the Plaintiffs' credibility or character for truthfulness.

124. In her capacity as prosecutor, Defendant Helper is not authorized by statute or the common law to in any way attempt to influence the Fairview City Manager's staffing of

police officers or the organization of the Fairview Police Department. Because Defendant Helper's unethical and illegal actions exceed the scope of her authority as a district attorney, she is not entitled to any immunity from her tortious and illegal conduct.

## COUNT I: DEPRIVATION OF DUE PROCESS
### *42 U.S.C. § 1983*

125.    The Defendants acted under color of state law in carrying out their unlawful actions.

126.    Plaintiffs, as P.O.S.T. commissioned police officers, have a constitutionally protected property interest in their continued employment created by virtue of T.C.A. § 38-8-301 *et seq.*, as well as by the Fairview Police Policy & Procedures Manual, which guarantees the procedures afforded by T.C.A. § 38-8-304, requiring both notice in writing of all charges, together with an opportunity to respond to the charges. Plaintiffs have a reasonable expectation of continued employment in the absence of bad conduct.

127.    Plaintiffs were entitled to a Pre-Termination or Pre-Dismissal Hearing and an opportunity to present evidence prior to the determination that they would be dismissed from their employment. Because Defendant Helper is not employed by the City of Fairview and could not be compelled to testify during any pre-dismissal hearing, Plaintiffs were unable to cross-examine Defendant Helper and receive a meaningful name-clearing hearing.

128.    Defendant Helper's decision to *Giglio* impair the Plaintiffs constituted an adverse employment action. Plaintiffs were given neither notice of the charges nor an opportunity to respond to the Defendant Helper prior to the publication of her false statements. The Defendant Helper did not present the WCSO report to any judge for an *in camera* hearing to determine the admissibility of the WCSO report. The Defendants have no procedure

26

implemented to determine the validity of Defendant Helper's unlawful actions. There is no ability for the Plaintiffs to appeal the Defendant Helper's decision.

129.     Scott Collins terminated Plaintiffs prior to the Pre-Dismissal Hearing, in violation of the Plaintiffs' rights to due process. Mr. Collins is a policymaker for purposes of Section 1983. He has been delegated power to make employment policy and to implement that policy. The City of Fairview is therefore liable for Mr. Collins' unconstitutional actions.

130.     Plaintiffs thereafter lacked a meaningful post-deprivation remedy.

131.     Plaintiffs have a constitutionally protected liberty interest in their professional reputations, which have been damaged by the Defendants' false claims and accusations of *Giglio* Impairment.

132.     Defendant Helper's actions were not activities associated with the judicial process, or her role as an investigator, or pursuant to any administrative role. Defendant Helper's actions were based upon circumstances, as she knew them, such that her conduct was inherently unreasonable.

133.     The Defendants knew or should have known that the Plaintiffs rights to due process were clearly established.

134.     A *Giglio* impairment is the penultimate reputation-tarnishing allegation that could be levied against a police officer. The impairment affects not only the Plaintiffs' professional reputations, but also their reputation as citizens within the community.

135.     Defendant Helper knew that the law regarding any future impeachment of Plaintiffs is well established. Defendant Helper is fully aware that nothing within the WCSO report could be used to impeach the credibility of the Plaintiffs at any point in the prosecution of a criminal case.

136.     Armed with the knowledge that her statements of and concerning Plaintiffs were patently false, Defendant Helper published the statements to the Fairview City Manager for the express purpose of tarnishing Plaintiffs' professional reputations and causing their termination, which statements were also contained in a written public record.

137.     Defendant Helper knew that her false statements would be republished in any Notice of Intended Dismissal sent to Plaintiffs, which is also a public record that would become a permanent part of Plaintiffs' personnel files.

138.     Prior to Plaintiffs' Pre-Dismissal Hearing, Scott Collins published statements about the Defendant Helper's *Giglio* impairment to the media.

139.     The Defendants' proffered reasons for *Giglio* impairment and for terminating Plaintiffs is a pretext for an unlawful motive.

140.     By virtue of the unique and devastating circumstances of a *Giglio* impairment within the law enforcement community, the damage to the reputation of a police officer is complete at the moment it is published.

141.     The stigma of the Defendant Helper's false *Giglio* impairment constitutes harm to Plaintiffs' reputation, which was coupled with a deprivation of Plaintiffs' tangible interests and property rights in their continued employment as police officers absent bad conduct, as well as Plaintiffs' status as police officers.

142.     The loss of Plaintiffs property and liberty interests was in conjunction with the injury to their reputation, which was the proximate cause and cause in fact of Plaintiffs' terminations.

143.     A *Giglio* impairment is a state-imposed burden and/or a state-imposed alteration of the Plaintiffs' status or rights.

144.     A *Giglio* impairment is of such universal significance to police officers that it implicates their liberty interests.

145.     There were no complaints about Plaintiffs' performance except for the unqualified and improper opinion from Defendant Helper, and City Manager Scott Collins himself did not believe the Defendant Helper's opinion to be true.  The Defendant City of Fairview is liable for the denial of Plaintiffs' due process rights by dismissing Plaintiffs, admittedly with no factual basis whatever.

**COUNT II:  UNLAWFUL RETALIATION FOR PLAINITFFS' EXERCISE OF CONSTITUTIONALLY PROTECTED RIGHTS**
*42 U.S.C. § 1983*

146.     Plaintiffs engaged in constitutionally-protected activity by filing a previous federal lawsuit.

147.     Plaintiffs engaged in constitutionally-protected activity by speaking out on matters of public concern in their capacity as private citizens during interviews with the media while they were not on the job.

148.     The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment.

149.     The individual right to speak out to the media on matters of public concern in their capacity as private citizens not on duty was also clearly protected activity under the First Amendment.

150.     Plaintiffs spoke out on matters of public concern in their capacity as citizens of Fairview.   Pursuant to General Order 2.02, once Plaintiffs had knowledge of other members violating laws, ordinances or departmental rules, they reported the violations to the City Manager and to Defendant Kim Helper, to no avail.

151.    Plaintiffs were thereafter placed on administrative leave, during which time they made reports to the media about the misconduct between members of the Fairview PD and individuals at Apex and UPS security.

152.    Plaintiffs made separate reports to the media by provided copies of recordings demonstrating wrongdoing, corruption, and conspiracy to violate the U.S. Constitution at the hands of employees and elected officials within the City of Fairview. At the time the statements and publications were made, Plaintiffs were not acting pursuant to any official duties within the scope of their employment.

153.    The Defendants knew or should have known that that the law regarding Plaintiffs' protected activity was clearly established under the First Amendment.

154.    The Defendants had no adequate justification for treating Plaintiffs differently than other police officers, acting instead with a purely retaliatory motive.

155.    Defendant Helper's false allegations of Plaintiffs' credibility and her improper and unethical decision to render Plaintiffs *Giglio* impaired, was not the real reason for her illegal actions.

156.    Plaintiffs' prior lawsuit was settled and they were reinstated to active duty. Since that time, Plaintiffs have been performing their duties in accordance with Fairview policy and to the satisfaction of the Fairview Chief of Police and the City Manager.

157.    Defendant Helper has informed others that she had "other concerns" with Plaintiffs that was not discussed in the WCSO report that she considered in reaching her decision to refuse to prosecute cases involving Plaintiffs.

158.    Defendant Helper's proffered reason for *Giglio* impairment is a pretext for an unlawful and retaliatory motive.

159.     Because Plaintiffs are P.O.S.T. certified, they are required to work at least nine (9) months out of the year in order to maintain certification. Plaintiffs have been deprived of the right to continue being P.O.S.T. certified, which constitutes a separate adverse employment action.

160.     Approximately two months after reinstatement, Plaintiffs were terminated, which constitutes an additional adverse employment action.

161.     The cause in fact and the proximate cause of Plaintiffs' termination was that they had engaged in constitutionally-protected activity.

## COUNT III:  NEGLIGENCE *PER SE*
## VIOLATION OF T.C.A. § 39-16-403.
## OFFICIAL OPPRESSION

162.     Defendant Helper is a public servant acting under color of office who purported to act in her official capacity.  Defendant Helper likewise took advantage of her actual or purported official capacity in carrying out her unlawful and retaliatory actions against the Plaintiffs.

163.     Defendant Helper intentionally subjected the Plaintiffs to mistreatment, and did so knowing that her conduct was and is unlawful.

164.     Defendant Helper owed the Plaintiffs a duty of care to act lawfully and obey Tennessee law, including T.C.A. § 39-16-403.

165.     Defendant Helper engaged in wrongful conduct falling below the standard of professional conduct required by her office as District Attorney, and therefore breached the duty she owed to Plaintiffs, resulting in an injury to Plaintiffs.

166.    Defendant Helper's violation of the criminal statute, T.C.A. § 39-16-403, constitutes a breach of a statutorily imposed duty, and grounds for a civil action for a *per se* tort. Defendant Helper's violation of the statute was the cause in fact and proximate cause of the injury to Plaintiffs.

167.    Pursuant to Tennessee law, the Defendants' violation of T.C.A. § 39-16-403, a criminal statute prohibiting official oppression, therefore constitutes negligence *per se*.

## COUNT IV: TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS RELATIONSHIP AND PROSPECTIVE BUSINESS RELATIONSHIPS

168.    Defendant Helper was aware that Plaintiffs were employed by a third party, the City of Fairview Police Department. Plaintiffs had a business relationship and a business interest in their continued employment.

169.    Defendant Helper was aware that it is common and routine for P.O.S.T. certified police officers to transfer to other police departments. All police agencies in Middle Tennessee constitute an identifiable class of third parties in which Plaintiffs had a prospective business relationship.

170.    Defendant Helper intentionally, by improper motive and improper means, procured the discharge of Plaintiffs from the Fairview Police Department. Defendant Helper acted with an improper motive and through improper means including, but not limited to, through misrepresentation, defamation, breach of her professional duty as an attorney, unethical conduct, overreaching, and through undue influence.

171.    Plaintiffs prospective business relationship with third-party police departments has ended by virtue of Defendant Helper's false *Giglio* impairment of the Plaintiffs. Plaintiffs

are unable to be hired by any other police department due to Helper's improper assertion that they are *Giglio* impaired.

172.     As a direct and proximate cause of the actions of Defendant Helper and the Defendant City of Fairview, Plaintiffs have been damaged and continue to be damaged.

## COUNT V: DEFAMATION
## & FALSE LIGHT INVASION OF PRIVACY

173.     Defendant Helper published statements, orally and in writing, that she could not prosecute any case involving Plaintiffs by virtue of *Giglio v. U.S.*, 405 U.S. 150 (1972). Defendant Helper stated that the WCSO report was the basis of her determination, knowing that her statements were false.

174.     The import of Defendant Helper's statement was to portray the Plaintiffs as *Giglio* impaired officers who are guilty of criminal acts involving dishonesty or other misconduct bearing on their character for truthfulness.

175.     The import of the Defendant Helper's defamatory statement was to portray the Plaintiffs as dishonest and that their testimony could be impeached at trial.  The false allegations exposed and continues to expose the Plaintiffs to public hatred, contempt, ridicule and disgrace.

176.     Defendant Helper's statements were false at the time they were made.

177.     Defendant Helper's false and defamatory statements directly contradict the WCSO report itself.

178.     Because Defendant Helper's false allegations were written in an email that is a public record they constitute libel.

179.    Because Defendant Helper's false allegations were also stated orally to a third party, they also constitute slander.

180.    The nature of Defendant Helper's false statements constitute libel *per se* and slander *per se*.

## COUNT VIII:  DEFAMATION BY IMPLICATION OR INNUENDO

181.    Because Defendant Helper omitted facts, which, if properly presented would not have created a negative impression of the Plaintiffs, Defendant Helper is guilty of defamation by implication or innuendo.

## COUNT IX:  FALSE LIGHT

182.    Defendant Helper's false accusations placed the Plaintiffs before the public in a false light.

183.    Defendant Helper's false accusations also place Plaintiffs in a false light within a cognizable and reasonably foreseeable group consisting of fellow police officers and other officers within the State of Tennessee.

184.    The false light in which the Plaintiffs were placed would be highly offensive to a reasonable person.   Defendant Helper had actual knowledge of or acted in reckless disregard to the falsity of the published matter and the false light in which the Plaintiffs would be placed.

185.    By virtue of Defendant Helper's false accusations, Plaintiffs have suffered irreparable damage to their professional and personal reputations, and have suffered damaged due to their termination.

186.     Because Defendant Helper's actions were intentional, malicious, or at a minimum, reckless, she must answer in both compensatory and punitive damages in an amount proven at trial and sufficient to deter others from misconduct of a similar nature.

## COUNT X: BREACH OF SETTLEMENT AGREEMENT

187.     In consideration of the promises set forth in the Settlement Agreement entered into by the parties on September 1, 2016, Plaintiffs agreed to voluntarily dismiss the case of Stockdale et al. v. City of Fairview, Tennessee, et al., Case No. 3:16-cv-01945 (M.D.Tenn.).

188.     A copy of the Settlement Agreement is attached hereto as **Exhibit 16**.

189.     Plaintiffs were to be reinstated as Lieutenants, which was a material term of the Settlement Agreement and Release entered into by Plaintiffs.

190.     The Defendant City of Fairview breached the agreement by unlawfully terminating the Plaintiffs without cause and without any justification to do so.

## INJUNCTIVE RELIEF

191.     As alleged herein, Plaintiffs have been unlawfully retaliated against and terminated by virtue of the Defendants' misconduct and in contravention to their established constitutional rights.

192.     The public interest will be served by ending the Defendants' illegal and retaliatory conduct by vindicating the Plaintiffs' constitutionally protected rights.

193.     Plaintiffs face irreparable injury by virtue of their loss of employment and inability to seek future employment as police officers, by virtue of Defendant Helper's false *Giglio* impairment.

194.     Plaintiffs face irreparable injury by virtue of the loss of their P.O.S.T. commission, damage to their professional pride and standing in professional organizations, and the loss of professional opportunities that comes with employment as a police officer, which is a unique position.

195.     The irreparable injury that Plaintiffs face is real and immediate. An award of back-pay will not fully compensate Plaintiffs.

196.     The unlawful retaliation that Plaintiffs have been subjected to will not end unless this Court enjoins it.

## PUNITIVE DAMAGES

197.     Because the actions of the Defendant Helper were intentional, malicious, fraudulent, or at a minimum reckless, she must answer in both compensatory damages and punitive damages.

**WHEREFORE**, Plaintiffs demand:

1. That process be issued and the Defendants be required to answer within the time required by law;

2. That the Court upon final hearing declare and find that the actions of the Defendants have violated the procedural and substantive due process rights of the Plaintiffs, which rights are guaranteed by the Fifth and Fourteenth Amendment to the U.S. Constitution;

3. That the Court upon final hearing declare and find that the actions and policy of the Defendants have violated Plaintiffs' rights to free speech and access to the Courts, which rights are guaranteed by the First Amendment to the U.S. Constitution;

4. That the Court upon final hearing declare that Defendant Helper is individually liable for defamation, defamation by implication, false light, and slander;

36

5. That the Court upon final hearing declare that Defendant Helper is liable under the doctrine of negligence per se for their violation of T.C.A. § 39-16-403;

6. That Plaintiff Pat Stockdale be awarded one million dollars ($1,000,000) in compensatory damages against the Defendant City of Fairview and Defendant Helper, and five million dollars ($5,000,000) in punitive damages against the Defendant Helper.

7. That Plaintiff Shane Dunning be awarded one million dollars ($1,000,000) in compensatory damages against the Defendant City of Fairview and Defendant Helper, and five million dollars ($5,000,000) in punitive damages against the Defendant Helper.

8. That the Court issue a permanent injunction enjoining the Defendants from further deprivation of the constitutional rights of the Plaintiffs and any further attempts to unlawfully terminate them from the City of Fairview Police Department;

9. That Plaintiffs be awarded attorney's fees, expenses, and costs as authorized under 42 USC § 1988.

10. The Plaintiffs be awarded such damages as will fully compensate them for all injury caused by the Defendants' actions and failure to act as alleged herein, and that Plaintiffs be awarded such additional and general relief to which they may be entitled, at law or in equity.

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully Submitted,

THE BLACKBURN FIRM, PLLC


W. Gary Blackburn (#3484)
Bryant Kroll (#33394)
213 Fifth Avenue N., Suite 300
Nashville, TN 37219
Telephone: (615) 254-7770
Facsimile: (866) 895-7171
gblackburn@wgaryblackburn.com
bkroll@wgaryblackburn.com

38