IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LT. PAT STOCKDALE and LT. SHANE )
DUNNING, )
　 )
　　　Plaintiffs, )　　　　NO. 3:17-cv-00241
　 )　　　　JUDGE RICHARDSON
v. )
　 )
KIM HELPER, in her individual capacity, )
and THE CITY OF FAIRVIEW, )
TENNESSEE, )
　 )
　　　Defendants. )

## MEMORANDUM OPINION

Pending before the Court is the motion for summary judgment filed by Defendant Kim

Helper (Doc. No. 58, "Motion"); Plaintiffs Lt. Pat Stockdale and Lt. Shane Dunning filed a

response in opposition (Doc. Nos. 81, "Response"), to which Helper replied (Doc. No. 93,

"Reply"). Helper has also filed a Motion to Strike (or Disregard) Plaintiffs' Responses to Helper's

Statement of Facts and Material Objected to in Plaintiffs' Statement of Facts (Doc. No. 96,

"Motion to Strike"), to which Plaintiffs responded (Doc. No. 98) and Helper in turn replied (Doc.

No. 101). For the reasons discussed below, the Motion will be granted in part and denied in part,

and the Motion to Strike will be granted in part.

## BACKGROUND

### A. Factual Background[1]

Plaintiffs Pat Stockdale and Shane Dunning served as lieutenants with the Fairview Police

Department ("FVPD") in the municipality of Fairview in Williamson Country, Tennessee until

---

[1] Unless noted otherwise, the facts below are drawn from only those facts which are undisputed in
Plaintiffs' Response to Defendant's Statement of Undisputed Facts (Doc. No. 83), Defendant's
Response to Plaintiffs' Statement of Undisputed Facts (Doc. No. 94), and the affidavits, deposition

their termination in or around December 2016. Defendant Helper is the elected District Attorney General for Tennessee's 21st Judicial District, which includes Hickman, Lewis, Perry, and Williamson Counties.

In early February 2016, Plaintiff Stockdale contacted Defendant Helper and expressed his concerns regarding particular topics, (hereinafter, the "APEX Matters") namely FVPD's relationship with two security firms, Apex Security Group (APEX) and Uniform Protected Services (UPS). APEX employed Fairview officers to work security for events in Nashville. On February 5, 2016, Stockdale sent a text message to Helper stating that another officer told Stockdale that he (the other officer) was asked to falsify documents regarding FVPD's ties with APEX and UPS. Specifically, Stockdale expressed his concern that an officer was backdating secondary-employment forms and that certain officers (who were working part time for APEX) had been issued false credentials that misrepresented them as full-time police officers with FVPD.[2] In the text message, Stockdale requested that Helper have the Tennessee Bureau of Investigation ("TBI") investigate the APEX Matters.[3] Helper did not respond. On February 9, 2016, Stockdale sent to Helper additional text messages (1) stating that Sergeant Ronnie Connor had admitted to falsifying government documents and (2) asking for Helper's advice. Helper responded that she could not advise Stockdale because she does not represent Stockdale or the department.

---

excerpts, and other exhibits submitted by the parties in support of and in opposition to Defendant's motion for summary judgment.

[2] According to Plaintiffs, "[s]Tate law requires officers performing security services outside their primary jurisdiction to be full-time, sworn police officers." (Doc. No. 81 at 5 (citing T.C.A. § 62-35-141)).

[3] It is disputed whether Helper requested TBI investigate the APEX Matters, whether a TBI investigation of the APEX Matters actually occurred, and the scope of any TBI investigation of the APEX Matters to the extent any took place.

On February 16, 2016, the same day that Fairview Police Chief Terry Harris announced that he was retiring, Helper asked her subordinate, Assistant District Attorney Sean Duddy, whether Director Joey Kimble was interested in the Fairview police-chief job. Helper expressed to Duddy her belief that Director Kimball would make a good chief of police because he has good leadership skills. Helper stated that she would advocate for Director Kimble if he was interested, and stated, "God help us if it's Dunning or Stockdale." She agreed with Duddy that having Dunning or Stockdale as chief would be "worse than Sanders or Clinton as the next President." (Doc. No. 1-2). Helper wrote a letter of recommendation for Kimble in October 2016.

On February 26, 2016, Helper met Williamson County Sheriff Jeff Long at a political event. Sheriff Long told Helper he had received a request that his office, the Williamson County Sherriff's Office ("WCSO"), conduct a criminal investigation of FVPD.

On February 29, 2016 the members of the Fairview Board of Commissioners held a secret meeting. During the meeting the Board and then-City Manager ("CM") Wayne Hall discussed an investigation that Hall was conducting regarding alleged corruption within FVPD, including, *inter alia*, the hiring of Ronnie Williams, a FVPD officer. During the February 29, 2016 meeting, the Fairview Board of Commissioners and CM Hall called Sheriff Long and requested that WCSO investigate FVPD.

On March 1, 2016, CM Hall placed Plaintiffs on administrative leave.[4] CM Hall was asked to make sure Plaintiffs were suspended. He does not recall whether he was directed to do so by just one Board member, all Board members, or Chief Harris.

_____

[4] As stated in his deposition, Stockdale believes that the plan to place Plaintiffs on administrative leave was set during the February 29, 2016 secret meeting. (Doc. No. 83 at 48). According to Terry Amonette, a former officer of FVPD, it was decided during that meeting that Plaintiffs were to be put on administrative leave as a condition for Chief of Police Terry Harris returning to work with

The first meeting regarding WCSO's investigation of FVPD ("WCSO Investigation") was attended by CM Hall, Chief Harris, WCSO Detective Tameka Sanders, WCSO Sergeant Kevin Sheldon, and WCSO Captain David Beard. At the meeting, Sheriff Long assigned Detective Sanders to lead the WCSO Investigation.[5] Detective Sanders determined who would be interviewed, and she initiated contact with the interviewees. Detective Sanders and Sergeant Sheldon interviewed a number of FVPD officers who were not on suspension, including, but not limited to, Fairview Sergeant Kodi Knight, Officer Terry Amonette, Detective Jennifer Beach-Whittaker, and Sergeant Ronnie Connor.

The WCSO investigators asked Sergeant Kodi Knight only specific questions about the Plaintiffs but not about any other officers. Officer Amonette was asked about allegations that Stockdale had broken into homes. He told the WCSO investigators that allegation was a lie and that Stockdale was an honest man. His statement was never included in the final investigative report prepared by WCSO (the below-referenced WCSO Report).

Before the final WCSO Report was published, a deputy district attorney reported to Helper that allegations existed that Stockdale had assaulted someone who was taken away by ambulance. Helper provided that information to Detective Sanders. Also before the final WCSO Report was published, Helper sent to Detective Sanders texts and emails about a series of threatening and harassing social media posts directed towards Plaintiffs that Fairview Detective David Bohler published on his Facebook page.

---

FVPD. During his deposition, Plaintiff Dunning stated that he does not know whether Helper had any involvement with the decision to place Plaintiffs on leave.

[5] The date of this meeting is not stated in the record.

On May 19, 2016, Fairview Mayor Patti Carroll announced at a Board of Directors meeting that Sheriff Long was closing the WCSO Investigation on May 20, 2016. Detective Sanders wrote a report of her findings in her own words ("WCSO Report"). Detective Sanders provided Helper drafts of the WCSO Report on June 6, 2016 and June 21, 2016. Upon review of the WCSO Report, Helper determined that there was no evidence to support the prosecution of any party.[6]

The Fairview City Recorder published a redacted copy of the WCSO Report on the City of Fairview website on July 20, 2016. The published document concealed the names of Ronnie Connor, Detective Whittaker, and others, instead using the phrase "an employee."

On July 21, Plaintiffs Stockdale and Dunning filed a lawsuit in this Court against the City of Fairview and seven individual defendants (namely, Harris, Hall, and Carroll, as well as the then-incumbent Vice Mayor of Fairview and three Commissioners serving at the time on the Fairview Board of Commissioners), individually and in their official capacities. Plaintiffs claimed these defendants violated Plaintiffs' constitutional rights under the First and Fourteenth Amendments, and the Tennessee Public Protection Act. Plaintiffs also brought various causes of action under Tennessee State law including official oppression, defamation, false light, and slander. *Stockdale v. City of Fairview, TN*, No. 3:16-cv-01945 (M.D. Tenn.) ("Prior Action").

---

[6] Plaintiffs assert that Sanders sent two final drafts of the WCSO Report to Helper—first on June 6 and "again" on June 21. (Doc. No. 94 at 18-19). It is unclear what, if any, differences exist between the drafts or the drafts and the final report published on July 20. Helper disputes that the drafts she reviewed (and from which she determined there was no evidence to support the prosecution of any party) were in fact final. (Doc. No. 83 at 11). Accordingly, whether Helper reviewed a final or preliminary report is disputed.

Shortly after Plaintiffs filed their complaint in the Prior Action, CM Hall served Notices of Intended Dismissal on Plaintiffs.[7] As it turned out, the intended dismissal portended by the Notices never came to fruition. On August 1, 2016, while the Prior Action was pending, Scott Collins took over as Fairview's new city manager. After reading the WCSO Report and finding the allegations against Plaintiffs to be unsubstantiated and/or stale, CM Collins concluded that reinstatement of Plaintiffs to their positions from administrative leave would be proper. (Doc. No. 65). The Prior Action was mediated and settled, and Plaintiffs returned to work on or about September 1, 2016. (*Id.*)

On August 26, 2016, Detective Sanders informed Helper via email that the Plaintiffs would return to work on September 1, 2016 and that, according to a news article, the Prior Action had been mediated and Plaintiffs would receive money damages as part of the settlement. Helper responded, "How are they getting $$$. They have been on paid leave." Detective Sanders likewise expressed dismay that Plaintiffs were getting money. Helper responded, "Thx I still won't take their cases. So not sure how that will help them." (Doc. No. 82-8 at 86). On September 7, 2016, Plaintiffs voluntarily dismissed all claims against the City pursuant to a joint stipulation under Fed. R. Civ. P. 41(a)(1)(A)(ii); the next day, Plaintiffs voluntarily dismissed all claims against the individual defendants pursuant to a notice of dismissal under Fed. R. Civ. P. 41(a)(1)(A)(i).[8]

In October 2016, one of Helper's assistants advised her that the city manager was restructuring the FVPD by eliminating the detective position. On October 18, Helper contacted

---

[7] The City of Fairview has a city manager-based form of government. The City Manager (CM) deals with the day-to-day operations of the city. The CM has the sole discretion to hire and fire employees of the City of Fairview.

[8] It appears that these dismissals resulted from a settlement agreement that was consummated after mediation.

Mayor Carroll to discuss her concerns regarding FVPD restructuring but Mayor Carroll referred Helper to CM Collins.

Later that day (October 18, 2016), CM Collins placed a phone call ("October 18 Call") to Helper to discuss her concerns regarding the proposed changes.[9] The October 18 Call became heated within the first 60 seconds. CM Collins explained to Helper why he thought the proposed changes to the detective division were a good idea. CM Collins thanked Helper for her comments but advised her that the changes would take place as he had proposed. Towards the end of their phone conversation, Helper and CM Collins briefly discussed Plaintiffs. CM Collins testified that he and Helper did discuss her concerns regarding Plaintiffs but did not discuss whether, pursuant to *Giglio v. United States*, 405 U.S. 150 (1972) ("*Giglio*"), she had to produce to defense attorneys the WCSO Report in cases in which either or both Plaintiffs may be called as a prosecution witness. CM Collins testified that he told Helper that he would not take any action regarding Plaintiffs' employment unless she submitted her concerns to him in writing. (Doc. No. 82-2 at 28).

On October 19, 2016, CM Collins emailed Helper stating: "As we discussed yesterday, I understand that you have some concerns regarding some members of our police department staff. If you can provide me with those concerns or directives, it will assist me with the reorganization of the department." (Doc. No. 1-12).

On October 20, 2016, CM Collins received the following email from Helper:

Mr. Collins, per our discussion, this Office has concerns about reports initiated/investigated solely by Officers Shane Dunning or Pat Stockdale. Because of the information contained in the Williamson County Sheriff's Department

---

[9] According to CM Collins's deposition testimony, after Mayor Carroll spoke to Helper but before the October 18 Call, he (CM Collins) spoke on the phone with Mayor Carroll, who relayed to him Helper's concerns regarding the proposed change to the detective position and also informed him that Helper was considering removing the assistant district attorneys ("ADAs") from Fairview City Court. During her phone call with CM Collins, Helper did not discuss the topic of ADAs in City Court.

Investigative report, we will be required to turn that report over to defense counsel in cases where Officers Dunning and/or Stockdale are involved. Without independent corroboration from another law enforcement officer and/or independent witnesses, the testimony of Officers Dunning and/or Stockdale may be impeached, thus creating challenges for the State in proving its case beyond a reasonable doubt. (*Giglio v. United States*, 405 U.S. 150 (1972)).

(Doc. No. 1-12, the "*Giglio* Email").

On October 31, 2016, CM Collins served Plaintiffs with Notices of Intended Dismissal. These Notices indicated that the assertions and content of Helper's *Giglio* Email nullified Plaintiffs' ability to act independently and credibly as law enforcement officers. Pursuant to the City Manual, CM Collins relieved Plaintiffs of their duties with pay for five working days to allow them to schedule a pre-termination hearing, if requested, without suffering a loss of wages.

On December 6, 2016, the City held a meeting regarding Plaintiffs' employment. Plaintiffs were represented at that meeting by attorneys Gary Blackburn, Robert Hassell, and Bryant Kroll.[10] Plaintiffs did not request Helper attend their pre-termination hearing, and she did not attend.[11] At the time of their termination, Plaintiffs were Lieutenants with FVPD.

## B. Procedural History

Plaintiffs filed their Complaint against the City of Fairview and Helper on January 31, 2017. (Doc. No. 1). Since then, Plaintiffs and the City of Fairview have settled all claims raised by Plaintiffs against the City of Fairview, which accordingly has been dismissed with prejudice. (Doc. No. 126). Plaintiffs' claims against Helper remain pending. Specifically, Plaintiffs maintain claims against Helper under 42 U.S.C. § 1983 asserting violations of their rights under the First

---

[10] There are questions as to whether the December 6, 2016 meeting occurred before or after Plaintiffs' termination. Because Plaintiffs' claims against the City of Fairview have been settled, the sequence of Plaintiffs' termination and the meeting is no longer relevant.

[11] Plaintiffs allege that they did not request Helper attend their pre-termination hearing because so doing would have been futile.

and Fourteenth Amendments to the United States Constitution, including their right to due process, free speech, and access to the courts. (Doc. No. 1). Plaintiffs also assert several state law claims against Helper, namely, official oppression under Tenn. Code Ann. § 39-16-403, tortious interference with a business relationship (the Plaintiffs' employment relationship with FVPD and prospective employment relationships with other police departments), defamation, and false light invasion of privacy. (*Id.*). Helper has moved for summary judgment, arguing that she is entitled to absolute immunity, or in the alternative, qualified immunity for all conduct giving rise to this action. (Doc. No. 59). As to Plaintiffs' state law claims, Helper argues that they should be dismissed because the Court should not exercise supplemental jurisdiction if Plaintiffs' federal claims are dismissed and because absolute and qualified immunity apply in state court. Helper also argues that Plaintiffs fail to establish any state law claims against her.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A

genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 F. App'x 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving

party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## DISCUSSION

I.   <u>Prosecutorial Immunity</u>

The Supreme Court recognizes two kinds of immunity for prosecutors sued under 42 U.S.C. § 1983: absolute prosecutorial immunity and qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). In support of her Motion to Dismiss (Doc. No. 15), Helper argued that the federal claims against her should be dismissed under Rule 12(b)(1) & (6) because she is protected by the doctrine of absolute prosecutorial immunity. Judge Trauger denied Helper's Motion to Dismiss, finding that Helper was not entitled to absolute prosecutorial immunity for *all* of the alleged conduct giving rise to this action. (Doc. No. 27 at 10, "MTD Order").[12] In particular, Judge Trauger found the following:

> What Helper overlooks, however, is that the Complaint alleges that the *Giglio* impairment was not, in fact, the reason for the plaintiffs' termination, nor is it the only alleged conduct by Helper that gives rise to this action. Rather, the Complaint alleges that the plaintiffs were terminated based on retaliation for both their constitutionally protected complaints about misconduct by other members of the department and the exercise of their constitutional rights in bringing the Prior Action. When read in the light most favorable to the plaintiffs, the Complaint suggests that Helper participated in – and improperly influenced – the retaliatory decision to terminate the plaintiffs and that Helper's implementation of the *Giglio* impairment was merely an attempt to legitimize that decision. Moreover, the Complaint also alleges that Helper participated in the earlier decision to place the plaintiffs on administrative leave, again in retaliation for their exercise of constitutionally protected rights, and that this took place even before the *Giglio* impairment had been issued. Thus, the fact that Helper is immune from liability arising out of her decision to *Giglio* impair the plaintiffs does not render her immune from liability in this action, which arises out of Helper's other unprotected conduct.

---

[12] This case was transferred from Judge Trauger to Judge Campbell on March 19, 2018 (Doc. No. 48) and from Judge Campbell to the undersigned district judge on October 24, 2018 (Doc. No. 53).

(*Id.* at 10-11). Judge Trauger did hold that "a prosecutor's decisions and actions regarding the designation of *Giglio* material (meaning material about a potential witness that would need to be disclosed to the defense in the event that the witness testifies) is covered by the doctrine of absolute prosecutorial immunity, even when such actions are taken outside of the realm of any particular criminal trial." (*Id.* at 9).

In her Motion to Dismiss, Helper did not argue that the claims against her should be dismissed on the basis of qualified immunity. Nonetheless, at that time, the Court held that qualified immunity did not bar the claims as pleaded in this action because the alleged conduct fell outside of the scope of Helper's prosecutorial duties and because the allegations sufficiently alleged that Helper had reason to know that Plaintiffs' constitutional rights were being violated by her actions. (Doc. No. 27 at 12).

Now, in support of the instant Motion, Helper argues that she is entitled to absolute prosecutorial immunity and, in the alternative, to qualified immunity. For the reasons discussed below, the Court finds that Helper is entitled to absolute prosecutorial immunity only for her decision that the WCSO Report contains information that must be turned over to defense counsel in cases in which Plaintiffs may be called as witnesses (the "*Giglio* impairment"). However, because she is not immune from liability for other conduct giving rise to this action, absolute immunity does not bar any claims against her. She is also not entitled to qualified immunity for any of the claims against her.

### A. Absolute Prosecutorial Immunity

Prosecutors are absolutely immune from liability under § 1983 for conduct "intimately associated with the judicial phase of the criminal process[.]" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Absolute prosecutorial immunity

is based on public policy considerations, particularly the concern that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decision instead of exercising the independence of judgment required by his public trust." *Id.* at 485 (quoting *Imbler*, 424 U.S. at 423). The Supreme Court has recognized that although absolute prosecutorial immunity may "leave unredressed the wrongs done by dishonest officers" it is necessary to prevent "those who try to do their duty [from enduring] the constant dread of retaliation." *Id.* at 484 (quoting *Imbler*, 424 U.S. at 428).

Absolute immunity does not extend to "a prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings[.]" *Rouse v. Stacy*, 478 F. App'x 945, 948 (6th Cir. 2012). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 269 (citing *Burns,* 500 U.S. at 486).

Helper argues that all of her conduct underlying a cognizable cause of action against her is protected by absolute prosecutorial immunity. (Doc. No. 59 at 13-19). Helper also argues that evidence has established that she did not take any "other action" beyond those actions entitled to absolute immunity. (*Id.*).

As this Court stated in its MTD Order, a prosecutor's decision to *Giglio* impair an officer is entitled to absolute prosecutorial immunity. (Doc. No. 27 at 9 ("[A] prosecutor's decisions and actions regarding the designation of *Giglio* material (meaning material about a potential witness that would need to be disclosed to the defense in the event that witness testifies) is covered by the doctrine of absolute prosecutorial immunity, even when such actions are taken outside of the realm of any particular criminal trial." (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 348-49 (2009))).

Specifically, Judge Trauger held, and this Court agrees, that "Helper is immune from liability arising out of her decision to *Giglio* impair the plaintiffs." (*Id.* at 11).

Despite the MTD Order, in their Response, Plaintiffs argue that Helper is not entitled to immunity for her *Giglio* impairment of Plaintiffs, for two reasons. First, Plaintiffs argue that "[t]his Court has already denied Defendant Helper immunity when she moved to dismiss Plaintiffs' complaint." (Doc. No. 81 at 21). But the MTD Order was clearly not a blanket denial of immunity. (Doc. No. 27 at 11 ("Helper is immune from liability arising out of her decision to *Giglio* impair the plaintiffs . . ."). Rather, the Motion to Dismiss was denied because "the Complaint alleges that the *Giglio* impairment was not, in fact, the reason for the plaintiffs' termination, nor is it the only alleged conduct by Defendant Helper that gives rise to this action." (*Id.* at 10). But now, at the summary judgment stage, Plaintiffs argue that they "were terminated because of Helper's false *Giglio* impairment." (Doc. No. 81 at 26). In fact, Plaintiffs state that "[t]he sole reason for Plaintiffs' terminations was Helper's email." (*Id.* at 18). Accordingly, the survival of Plaintiffs' claims will turn largely on whether Helper is immune from liability for sending the *Giglio* Email to CM Collins.

Second, Plaintiffs argue that Helper is not entitled to absolute prosecutorial immunity for her *Giglio* impairment of Plaintiffs because her use of the *Giglio* impairment to instigate Plaintiffs' removal from their employment was a pretext to hide an unlawful and retaliatory motive. Plaintiffs appear to allege that Helper *Giglio* impaired Plaintiffs not because she truly believed in good faith that they were *Giglio* impaired, but rather to harm Plaintiffs in retaliation for their filing and settling the Prior Action as well as their communications with the media regarding allegations of corruption in the FVPD. (Doc. No. 81 at 1, 21-25). According to Plaintiffs, because "there is absolutely nothing in the WCSO report that a defense attorney could use to impeach either

Dunning or Stockdale . . . Helper's publication of the *Giglio* impairment to the City Manager was not proper." (Doc. No. 81 at 19; *see also id.* at 23 ("No known case affords prosecutors absolute immunity for falsely *Giglio* impairing police officers without any basis in law or fact . . .")). However, prosecutors are protected by absolute immunity "even if they act 'maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence.'" *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003); *see also Red Zone 12 LLC v. City of Columbus*, 758 F. App'x 508, 514 (6th Cir. 2019) ("Whether the prosecutor has an improper motive, acts in bad faith, or even acts in an unquestionably illegal manner is irrelevant."). Therefore, even if Helper's *Giglio* impairment was pretextual, it is still protected by absolute immunity.

As Judge Trauger has already found, Helper's *Giglio* impairment falls within her duties in functioning as a prosecutor (Doc. No. 28). A prosecutor's professional evaluation of a witness— and his or her decision whether or not to prosecute based upon that evaluation— is a judicial function entitled to absolute immunity. *See Roe v. City and County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997). Absolute immunity extends to professional evaluations of a witness "even if that judgment is hard, unfair or clouded by personal animus." *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003). Regardless of the basis underlying a personal evaluation, the evaluation "does not become less judicial by virtue of an allegation of malice or corruption of motive." *Mireles v. Waco*, 502 U.S. 9, 13 (1991).

Although Judge Trauger found that Helper's *decision* that the WCSO Report contained *Giglio* material is entitled to absolute immunity, the Court did not decide whether Helper's act of *communicating* that decision to CM Collins through the *Giglio* Email is also protected conduct. Whether or not such a communication is entitled to absolute prosecutorial immunity has not been addressed in this circuit. The Court has found three cases directly on point, though they are of

limited utility because they conflict with one another and are not binding on this Court in any event.

In one case, *Botello v. Gammick*, 413 F.3d 971 (9th Cir. 2005), the Ninth Circuit found that two prosecutors had engaged in three types of conduct and came to a conclusion regarding the degree of immunity that each should be afforded. First, the court found that the prosecutors were not entitled to absolute immunity for defamatory comments they made to the plaintiff's current employer regarding the plaintiff's character and performance at his previous job (as an investigator employed by the local county sheriff's office) in order to sabotage his job prospects. *Id.* at 977. "When [the prosecutors] involved themselves in the . . . Police Department's personnel decision whether to hire [plaintiff], they were at best performing an administrative function and, as such, could only be entitled to qualified immunity." *Id.* at 977. Second, the court found that the prosecutors were entitled to absolute prosecutorial immunity for their attempt to have the plaintiff fired by communicating to the [plaintiff]'s employer that "the DA's Office would refuse to file any case where [plaintiff] participated in any phase of the investigation." *Id.* at 974. The court came to this second conclusion despite concerns it had with the scope of this non-prosecution policy and the prosecutors' lack of rationale for applying it. *Id.* Finally, the court found that the prosecutors' demand that the plaintiff not be involved in any aspect of any investigation was not protected by absolute immunity because such a demand attempt to dictate staffing decisions—which is an administrative function. *Id.*

In another case, *Beck v. Phillips*, 685 N.W.2d 637 (Iowa 2004), the Iowa Supreme Court reached the opposite conclusion regarding the immunity afforded to a prosecutor's communications with a police officer's employer. In *Beck*, the court held that although the prosecutor was entitled to absolute prosecutorial immunity for his decision not to prosecute any

cases in which the plaintiff, a police officer, would appear as a witness, the prosecutor was not entitled to absolute immunity for the action of writing letters to the police department and the mayor conveying his decision not to prosecute. *Id.* at 644. Writing letters, the court held, "was not deciding not to prosecute a case, but instead merely advising local law enforcement authorities on how future criminal prosecutions should be conducted and how his office would deal with those cases." *Id.* at 645. The Court held that "it strain[ed] reason too far to characterize [the prosecutor's] writing of his letters as an activity 'intimately associated with the judicial phase of the criminal process.'").

In a third case, *Singer v. Steidley*, No. 13-cv-72, Doc. No. 19, Order (N.D. Okla. Apr. 30, 2013), in an unpublished order, the court held that two district attorneys were not entitled to absolute prosecutorial immunity for disclosures made to law enforcement officials, courts, and criminal defense attorneys regarding allegations that the plaintiff, a criminal investigator for the local police department, "had lied in sworn statements concerning a criminal investigation 18 months earlier . . . purportedly pursuant to [*Giglio*]." *Singer* at 1; *see also Singer v. Steidley*, No. 13-cv-72, 2014 WL 580139, at *3-6 (N.D. Okla. Feb. 12, 2014). Specifically, the court found that the prosecutors' "disclosures to the . . . police chiefs and the Oklahoma Criminal Defense Attorney Website were conceivably administrative and/or investigative rather than prosecutorial in nature." *Id.* Therefore, the *Singer* court applied the qualified immunity standard to the prosecutors' disclosures and, under that standard, denied the defendants' motion to dismiss the plaintiff's claim for relief for, *inter alia*, violations of his Fourteenth Amendment rights to the extent he alleged disclosures of the *Giglio* material to police chiefs, the criminal defense attorney website, and the local newspaper. *Id.* at *1.

After considering the foregoing decisions and conducting a functional analysis of Helper's actions at issue here, the Court finds that Helper's *Giglio* Email to CM Collins was not so "intimately associated with the judicial phase of the criminal process" as to be entitled to absolute prosecutorial immunity. *Imbler*, 424 U.S. at 430. In finding that Helper's communication was beyond the scope of her prosecutorial duties, the Court looks to "the nature of the function performed, not the identity of the actor who performed it[.]" *Forrester v. White*, 484 U.S. 219, 229 (1988); *see also Cooper v. Parrish*, 203 F.3d 937, 946-47 (6th Cir. 2000).[13] "[T]he critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process." *Ireland v. Tunis*, 113 F.3d 1435, 1443 (6th Cir. 1997) (quoting *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993)).

Helper's *Giglio* Email was sent two days after the October 18 Call between Helper and CM Collins. According to testimony given by CM Collins during his deposition, the topic of Plaintiffs was brought up in the context of proposed changes to the organization of FVPD and things that had occurred within FVPD that Helper did not like—"general [sic] not liking the direction of the Fairview Police Department as she knew it." (Doc. No. 82-2 at 26).[14] In particular, CM Collins

---

[13] In her Reply to Plaintiffs' Response, Helper argues that her October 20, 2016 *Giglio* Email is protected by absolute immunity even though it was not connected to "any particular criminal trial," and even if it is sent "for an improper personal motive." (Doc. No. 93 at 2). Although Helper cites to this Court's Order denying her Motion to Dismiss for this point, she misinterprets the Court's holding. The Court agreed with Helper that "absolute prosecutorial immunity applies even where the *protected conduct* is done for improper personal motives." (Doc. No. 27 at 9 (emphasis added)). The Court did not hold that *sending the email* —as opposed to the underlying decision to *Giglio* impair Plaintiffs—was protected conduct.

[14] Helper argues that the *Giglio* Email is not connected to her concern regarding FVPD's restructuring, stating that "merely because the two issues [the *Giglio* impairment and the restructuring of FVPD] were discussed during the same phone call does not mean one was done in retaliation of the other." (Doc. No. 93 at 3). But this argument misses the mark because Plaintiffs do not allege that the *Giglio* Email was sent in retaliation for Helper's concern over FVPD's restructuring. Instead, Plaintiffs imply that the *Giglio* Email was sent in retaliation for Plaintiffs'

testified that "she expressed her concerns for Lieutenants Dunning and Stockdale being returned to work." (Doc. No. 82-2 at 28). But CM Collins told Helper that he was not going to address that concern unless she submitted something in writing. Two days later, Helper published to CM Collins the *Giglio* Email. Both the October 18 Call and the follow-up *Giglio* Email related to FVPD staffing decisions. Accordingly, Helper's communication of the *Giglio* impairment was administrative rather than prosecutorial in nature and thus is not subject to absolute immunity.

### B. Qualified Prosecutorial Immunity

In the alternative, Helper argues that the doctrine of qualified immunity precludes each claim against her. Specifically, Helper claims that she is entitled to qualified immunity for her decision to *Giglio* impair Plaintiffs because (1) Plaintiffs do not have a constitutional right to freedom from *Giglio* impairment, and (2) any such right (even assuming it exists) was not clearly established at the time of the impairment. (Doc. No. 59 at 19-20). In response, Plaintiffs incorrectly argue that the issue of qualified immunity is foreclosed by the Court's denial of qualified immunity at the motion to dismiss stage (which the Court addressed *sua sponte*) and Helper's failure to appeal that decision. (Doc. No. 81 at 25-26).[15] Plaintiffs also argue that they "have a right to be

---

filing and settling the Prior Action as well as their communications with the media and in order to negatively influence FVPD's internal employment decisions regarding Plaintiffs. Furthermore, the fact that the two issues were raised on the same phone call is not the only evidence that suggests the topic of Plaintiffs was introduced within the context of internal employment decisions. As CM Collins stated during his deposition, Helper was expressing her general discontent over the direction of FVPD, including both bringing people back to work who have sued and the proposed changes. (Doc. No. 82-2 at 26). Finally, Helper's citation to two Sixth Circuit cases, *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2000) and *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007), is misleading here. These cases actually stand for the proposition that "temporal proximity (between protected conduct and retaliation), *standing alone*, is insufficient to establish a causal connection for a retaliation claim." *Tuttle*, 474 F.3d at 321 (emphasis added). This is irrelevant to whether two subjects discussed on the same phone call are connected.

[15] Helper did not waive the affirmative defense of qualified immunity for summary judgment purposes by failing to raise the issue at the motion to dismiss stage. The Sixth Circuit has held that

free from any constitutional deprivation, which includes the right to due process, free speech, and access to the courts." (*Id.*).

Because the Court has already found that Helper's *Giglio* impairment of Plaintiffs is entitled to absolute immunity, the Court need not address her argument in the alternative that she is entitled to qualified immunity for that conduct. Rather, the Court will address only whether her publication of the *Giglio* impairment to CM Collins—for which she is not entitled to absolute prosecutorial immunity—is subject to qualified immunity.[16]

Prosecutors may be entitled to qualified immunity for administrative, investigative, or other tasks that are within a prosecutor's official duties but are not intimately associated with the judicial

---

a waiver of qualified immunity "would generally only waive the defense for the state at which the defense should have been asserted. Thus, for example, a defendant who fails to timely assert the defense prior to discovery may waive the right to avoid discovery but may nonetheless raise the issue after discovery on summary judgment or at trial." *Baar v. Jefferson County Bd. of Educ.*, 476 F. App'x 621, 625 (6th Cir. 2012) (citing *English v. Dyke*, 23 F. 3d 1086, 1090 (6th Cir. 1994)). Therefore, Helper is not precluded from arguing she is entitled to qualified immunity at the summary judgment stage.

[16] In the MTD Order, the Court held that qualified immunity did not apply for two reasons: (1) "much of the conduct by Helper that is alleged in the Complaint . . . falls entirely outside of the scope of her prosecutorial duties . . . and is subject to no form of immunity" (Doc. No. 27 at 12), and (2) "to the extent that Helper's conduct did fall within her administrative and investigate duties, . . . the allegations clearly state that Helper had reason to know that plaintiffs' constitutional rights (to free speech and to due process of law) were being violated by her actions" (*id.*). Regarding the first reason, the Court recognized other conduct that Plaintiffs alleged contributed to their termination, including allegations that Helper participated in an illicit meeting to discuss suspending Plaintiffs in relation for their complaints against FVPD and attempting to coerce the city manager into firing the plaintiffs by threatening to un-staff the City Court. After discovery, it is undisputed that Helper did not attend the illicit meeting and did not discuss with CM Collins removing ADAs from City Court (although CM Collins was aware that this "threat" had been discussed by Helper and Mayor Carroll). Moreover, at the summary judgment stage, Plaintiffs now argue that they "were terminated because of Helper's false *Giglio*-impairment." (Doc. No. 81 at 26). In fact, Plaintiffs state that "[t]he sole reason for Plaintiffs' terminations was Helper's email." (*Id.* at 18). Therefore, as to whether Helper is entitled to qualified immunity, the analysis at the summary-judgment stage differs slightly from the analysis at the motion-to-dismiss stage. Nonetheless, the outcome remains the same, as discussed herein.

process. *See Lomaz v. Hennosy*, 151 F.3d 493, 497 (6th Cir. 1998). Unlike absolute prosecutorial immunity, qualified immunity does not apply where the defendant committed a constitutional violation and the right violated was a clearly established right of which any reasonable person in the defendant's position would have known. *Koubriti v. Convertino*, 593 F.3d 459, 471 (6th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether qualified immunity applies, this court employs a two-step test, considering (1) whether the facts alleged or shown by the plaintiff demonstrate that a constitutional right has been violated; and (2) whether that right was clearly established at the time of defendant's alleged misconduct. *Howell v. Sanders*, 668 F.3d 344, 353 (6th Cir. 2012). The Court has discretion to consider the steps of the qualified immunity analysis in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the second step, a right is clearly established when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While there need not be "a case directly on point" for the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In the qualified immunity context, if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate. *Morrison*, 583 F.3d at 400. Accordingly, the Court will first determine whether Plaintiffs have shown that a reasonable juror could find Helper's actions violated some clearly established

constitutional right to due process under the Fourteenth Amendment and to free speech and access to the courts under the First Amendment.

II.     Count I: 42 U.S.C. § 1983: Deprivation of Due Process

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law . . . ." U.S. Const. Amend XIV, § 1. To establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights. *Schmitt v. LaRose*, 933 F.3d 628, 642 (6th Cir. 2019); *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

Plaintiffs allege that Helper deprived them of their liberty interest in their employment without due process of law when she published her false *Giglio* impairment to CM Collins. According to Plaintiffs, Helper's false *Giglio* impairment caused their termination from FVPD and has rendered them unable to obtain employment as police officers in other departments. (Doc. No. 59 at 26-27). Because the Court has already found that Helper is entitled to absolute prosecutorial immunity for her decision to *Giglio* impair Plaintiffs, the Court will consider only whether Helper can be held liable under § 1983 for her decision to communicate the *Giglio* impairment to CM Collins.

The Due Process Clause protects an individual's liberty interest in his or her "reputation, good name, honor, and integrity" and "in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy." *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). A plaintiff may establish deprivation of a liberty interest in employment by demonstrating the public disclosure of stigmatizing information that "so negatively affects his or her reputation that it effectively

forecloses the opportunity to practice a chosen profession." *Id.* at 1420. But defamation alone is not enough to trigger this constitutional protection; rather, the alleged damage must be tied to "[s]ome alteration of a right or status 'previously recognized by state law[.]'" *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Paul v. Davis*, 424 U.S. 693, 711–12 (1976)). These claims are known as "stigma-plus" claims. Where an employee is stigmatized "by the voluntary, public dissemination of false information [(the "stigma")] in the course of a decision to terminate his employment [(the "plus")], the employer is required to afford him an opportunity to clear his name." *Id.* at 320; *see also Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) ("An injury to a person's reputation, good name, honor, or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with an employee's termination.").

The Sixth Circuit has identified five factors that a plaintiff must show in order to establish that he was deprived of a liberty interest and is entitled to a name-clearing hearing:

1. The stigmatizing statements were made in conjunction with the plaintiff's termination from employment;
2. The employer has not merely alleged improper or inadequate performance, incompetence, neglect of duty or malfeasance, but rather has charged the plaintiff with a wrong that has a stigmatizing impact;
3. The employer's stigmatizing statements or charges must be made public by the employer;
4. The plaintiff must show that the charges made against him were false; and
5. The public dissemination must have been voluntary.

*Wheeler v. Stafford*, No. 11-cv-57, 2013 WL 75050, at *3-4 (M.D. Tenn. January 4, 2013) (citing *Quinn*, 293 F.3d at 320). Even if the above requirements are met, a due process claim for the deprivation of a liberty interest will still fail where the plaintiff has not requested a name-clearing hearing. *Ludwig*, 123 F.3d at 410-411. "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn*, 293 F.3d at 320.

Here, the Court need not determine whether Plaintiffs have satisfied the five-factor test, because Plaintiffs' due process claim against Helper fails for another reason. As Helper correctly argues, Plaintiffs have not established that she is liable for the deprivation of Plaintiffs' liberty interest because she did not have the power to provide Plaintiffs due process. In support of this argument, Helper cites to *Williams v. City of Franklin, Tenn.*, 586 F. Supp. 2d 890 (M.D. Tenn. 2008) (Trauger, J.). The Court agrees that *Williams* is instructive. In *Williams*, this Court held that "where different actors are responsible for the 'stigma' and the 'plus,' as is the case here, 'for any number of reasons . . . one or more defendants whose actions collectively implicate a liberty interest may not be liable for the deprivation of that liberty interest.'" *Id.* at 899 (quoting *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005)). In *Williams*, a board member who initiated an investigation against the plaintiff was no longer a member of the board at the point the plaintiff was entitled to due process in the form of a name-clearing hearing. *Id.* Because the obligation to provide the plaintiff with due process resided with others, the plaintiff did not have a valid due process claim against the former board member. *Id.*

*Williams* relied in part on *Velez v. Levy*, which is also instructive here. In *Velez*, the plaintiff, a member of the community school board, alleged that the defendants (the Chancellor, other school board members, and investigators) caused her removal from office by fabricating a story about the plaintiff's criminal history. *Id.* at 79. The Second Circuit affirmed the district court's dismissal of the plaintiff's sigma-plus claim as to all of the defendants except the Chancellor. In doing so, the court held that a stigma-plus claim cannot lie against an individual who lacks the authority to provide process to the plaintiff. And because defendants "did not undertake or oversee the investigation, and they could order neither pre-removal review nor post-

removal remedies . . . they [could not] be held legally accountable for the alleged process failure." *Id.* at 93.

Here, it is clear that Helper did not have power to provide Plaintiffs with the process they allegedly were due either before or after their termination. Helper was not Plaintiffs' employer (or supervisor acting on behalf of Plaintiffs' employer); Helper was employed by the State of Tennessee and Plaintiffs by the City of Fairview. In asserting that Helper could have provided them due process, Plaintiffs can muster only the observation that they could not compel her to attend their termination hearing. And whether or not Plaintiffs could compel Helper to attend their termination hearing does not mean that Helper had the authority to provide Plaintiffs a name clearing hearing. Furthermore, it is undisputed that Plaintiffs did not even request Helper attend their hearing. Their argument that doing so would have been futile is not persuasive. Accordingly, even if Plaintiffs were entitled to due process in the form of a name-clearing hearing as a result of the stigma created in part by Helper's actions in connection with their termination from FVPD, Helper had no power to provide Plaintiffs that process.

Plaintiffs argue that "Helper does not have to be Plaintiffs' employer in order for them to assert a claim based on a protected liberty interest under the 'stigma-plus' test of *Paul v. Davis*, 424 U.S. 693, 701 (1976)." (Doc. No. 81 at 27). Generally, Plaintiffs are correct. "Both the Supreme Court and [the Sixth Circuit] have found protected liberty interests in reputation outside [the employment context]." *Meyers v. Village of Oxford*, 739 F. App'x 336, 339 (6th Cir. 2018). Indeed, the Supreme Court recognizes "actionable liberty interest deprivation [in] situations involving termination of government employment *or* the loss of a legal right or status previously enjoyed under state or federal law[.]" *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir. 1993) (emphasis added). However, this argument does not save Plaintiffs' due process claim against

Helper, for two reasons. First, although Plaintiffs attempt to categorize their deprivation as the loss of a legal right or status separate from the employment context, this case clearly falls within the employment context. Plaintiffs were government employees who allege they were terminated based on stigmatizing statements. Second, Plaintiffs' argument misses the point. In the cases Plaintiffs cite, the question before the courts was whether the plaintiff had established that he or she was deprived of a liberty interest and was entitled to a name-clearing hearing despite the case falling outside of the employment context. *See Meyers*, 739 F. App'x at 341. That is not the question here. The question here is whether Helper is someone who can be held liable, even assuming that Plaintiffs were deprived of a liberty interest without a name-clearing hearing to which they were entitled.[17] As noted above, she is not, irrespective of the fact that she is not Plaintiffs' employer

Accordingly, Helper's motion for summary judgment on Plaintiffs' claim for deprivation of due process will be granted.

III.   Count II: 42 U.S.C. § 1983: Retaliation for Plaintiffs' Exercise of Constitutionally Protected Rights

Second, Plaintiffs allege that Helper retaliated against them for exercising their First Amendment right to speak to the media (under the Speech Clause) and for filing their prior lawsuit (under the Petition Clause).

The First Amendment protects freedom of speech and "the right of the people . . . to petition the government for a redress of grievances." U.S. CONST. amend. I. First Amendment retaliation claims are analyzed under a burden-shifting framework. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). Retaliation in response for exercising these First Amendment rights

---

[17] Plaintiffs already have settled with the City of Fairview (Doc. No. 127)—which had the authority to provide Plaintiffs with due process.

can amount to a violation of those rights compensable under Section 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). To prevail on a claim of First Amendment retaliation, a plaintiff must first establish a prima facie case of retaliation by showing:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Id.* at 397; *see also Bloch v. Ribar*, 156 F.3d 673, 677-78 (6th Cir. 1998). If the plaintiff is able to make this showing, "the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Dye*, 702 F.3d at 294 (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)). If the employer makes such a showing, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* at 294–95.

## A. Retaliation in Violation of the Speech Clause

As to Plaintiffs' claim of retaliation under the Speech Clause, Plaintiffs argue that "Helper has not moved for summary judgment against the Plaintiffs' claim that she retaliated against them because of their reports to the media, their production of recordings to the media, or for any of [sic] First Amendment issues regarding speaking out to the media, which is alleged in Count II of their Complaint." (Doc. No. 81 at 30). Based on this argument, Plaintiffs chose not to support this claim evidentially or otherwise address it substantively. Instead, Plaintiffs merely argued that Helper (supposedly not having even moved under Rule 56 on this claim) has failed to carry her burden under Rule 56, meaning the claim should proceed to trial. (*Id.*) However, the Court does not agree with Plaintiffs that Helper has not moved for summary judgment on this claim. In support

of her Motion, Helper argues that "Plaintiffs cannot establish that *any* protected speech was a substantial and motivating factor in their termination." (Doc. No. 59 at 23) (emphasis added). Helper supports this argument as to Plaintiffs' communication to the media by stating, with citations to materials in the record:

- "General Helper was not personally affected by Plaintiffs' criticism of Chief Harris and the FVPD . . ." (*Id.*).
- She never spoke with CM Collins about retaliating against Plaintiffs for "reporting misconduct of other members of the FVPD." (*Id.* at 24).
- "When [Helper was] advised of the Apex matters by Lt. Stockdale, [she] informed the TBI, which came out to investigate." (*Id.* at 24).[18]

Although these points do not explicitly mention "the media," each relates to a topic that Plaintiffs allege they discussed with the media. (Doc. No. 1 ¶ 151 ("Plaintiffs were thereafter placed on administrative leave, during which time they made reports to the media about the misconduct between members of the Fairview PD and individuals at Apex and UPS security.")). It is clear that these points do not relate to Plaintiffs' claim of retaliation for filing the Prior Action; therefore, they must relate to Plaintiffs' claim of retaliation for speaking to the media.

The Court finds that Helper has satisfied her initial burden of showing an absence of evidence to support the third element of a prima facie case of retaliation, thus shifting the burden of production to Plaintiffs. Failure to properly respond to the arguments asserted in a motion for summary judgment can lead to the granting of summary judgment in favor of the moving party. *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006); *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (holding that the nonmoving party cannot "rest upon its mere allegations . . . , but rather must set forth specific facts showing that there is a genuine

---

[18] The Court recognizes that Defendants dispute whether TBI in fact came out to investigate. The Court does not take this statement as fact; it merely cites it as recognition that Helper did, in fact, address Plaintiffs' argument that Helper retaliated against them for speaking with the media.

issue for trial"). Accordingly, because Plaintiffs have not met their resulting burden of showing that disputes over material facts remain, Helper is entitled to summary judgment as to Plaintiffs' claim that she retaliated against them in violation of their First Amendment right to free speech.

### B. Retaliation in Violation of the Petition Clause

As to Plaintiffs' claim of retaliation under the Petition Clause of the First Amendment, Helper contests only the third element of Plaintiffs' retaliation claim, arguing that Plaintiffs cannot show a causal connection between the protected conduct and the adverse action. But before the Court addresses the merits of Helper's argument, the Court notes that neither party analyzed the existence (or lack thereof) of the first element: whether filing the Prior Action was a constitutionally protected activity. To that point, Plaintiffs did no more than cite *Thaddeus-X*, 175 F.3d at 391, for the unexceptional proposition that the First Amendment encompasses the "clear" right "to petition the Government for redress of grievances" (Doc. No. 81 at 31); Plaintiffs said nothing express about whether that "clear right" encompasses the right of government employees to file a lawsuit. Helper appears neither to contest the (rather incontestable) proposition that Plaintiffs did advance regarding the Petition Clause nor to otherwise address the first element. Although *Thaddeus-X* itself does not prescribe a "clear right" of access to the courts specifically for parties like Plaintiffs, the Court has undertaken its own analysis and finds that Plaintiffs' Prior Action was a constitutionally protected activity. The Court will explain its analysis here.

The Sixth Circuit's decision in *Thaddeus-X* relates specifically to a *prisoner's* right to access the courts. *Id.* at 388. The Sixth Circuit explicitly recognized the distinction between public employees and prisoners, stating "[p]risoners certainly do not have greater free speech rights than public employees, but the First Amendment interest that is of central importance to prisoners is their right to access the courts, grounded in the Petition Clause[.]" *Id.* And, as the Supreme Court

held in *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2010), the application of the Petition Clause in the context of government employment for retaliatory action, like that of free speech, is limited to matters of public concern. *Id.* at 390. Therefore, to determine whether Plaintiffs here engaged in a constitutionally protected activity by filing the Prior Action, Plaintiffs' conduct must be analyzed under the public concern test. And although the Prior Action asserted a First Amendment violation, its inclusion does not automatically mean that the Prior Action addressed a matter of public concern. "As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context of [the petition], as revealed by the whole record.'" *Id.* at 398 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

The Fifth Circuit's opinion in *Gibson v. Kilpatrick*, 838 F.3d 476 (5th Cir. 2016) is instructive here. In *Gibson*, the plaintiff, a former chief of police, sued the city alleging that he was fired in retaliation for a former lawsuit against the mayor, also for retaliation. In the original lawsuit, the plaintiff claimed that the mayor retaliated against the plaintiff for exposing the mayor's misappropriation of city funds. *Id.* at 480-481. The Fifth Circuit analyzed the content, form, and context of the original lawsuit and found that it was a matter of private concern. It is the small facts that diverge between *Gibson* and the case at hand that cause the Court to find that the Prior Action was a matter of public concern.

First, the content (i.e., subject-matter*)* of the Prior Action was Plaintiffs' alleged employment grievances, including, *inter alia*, claims of retaliation for protected speech, deprivation of due process, and violations of Plaintiffs' rights to equal protection under the law. Although the speech underlying the original retaliation claim involved exposing government corruption, at its core the Prior Action was an internal employment dispute. Plaintiffs had separately spoken to the City Manager, the FBI, and the media about the APEX scandal while on

administrative leave, which was indubitably a matter of public concern. However, the Prior Action was not a whistleblower suit; it sought only personal relief, did not seek to enjoin any public corruption, and did not request damages concerning the public. *See id.* at 485 (noting that "requests for personal relief alone counsel[] against finding that a suit [is] a matter of public concern"). As in *Gibson*, given the public's interest in effective city governance, it is conceivable that the public would be interested to know about the unrest within the police department; in some sense, therefore, the Prior Action would be considered a matter of public concern. *Id.* However, it is clear that the content of the Prior Action was predominately a personal employment grievance.

On the other hand, the form of the Prior Action suggests that it was a matter of public concern. Like the first lawsuit in *Gibson*, the Prior Action was a private lawsuit instead of a whistleblower action, which "counsels against holding that he spoke on a matter of public concern." *Id.* However, unlike the first lawsuit in *Gibson* (brought only against the mayor in his individual capacity, (i*d.* at 486), the Prior Action was against a governmental body (a municipality, the City of Fairview) and individual members of its governing body sued in their official capacity (the Board of Commissioners). The Fifth Circuit explicitly recognized the significance of such inclusion, stating "whistleblowers can bring First Amendment retaliation suits against governmental supervisors in their official capacities, thus implicating the public purse because official-capacity suits look only to the governmental entity for redress . . . a suit brought against a public official in his official capacity, or directly against a public entity, is more easily read as a matter of public concern." *Id.* Therefore, Plaintiffs inclusion of the City of Fairview and individuals in their official capacity as defendants in the Prior Action weighs in favor of finding that their filing the Prior Action was a matter of public concern.

Finally, as to context, the Prior Action was filed in the midst of significant controversy between the Board of Commissioners, City Manager, and FVPD. Unlike in *Gibson*, the Prior Action was not filed in the context of an ongoing personal feud between two individuals. In *Gibson*, the Fifth Circuit found relevant to the context analysis the abundance of evidence suggesting that "there was 'something between the chief and mayor personally'" (*id.* at 486-87), and that the plaintiff's speech was made in "furtherance of a personal employer-employee dispute." *Id.* at 486. On the other hand, the "APEX Security Scandal" at issue in the Prior Action involved multiple government agencies and multiple investigations, led to a number of officer suspensions, and was the topic of numerous news articles. Therefore, the underlying context of the Prior Action concerned public matters.

Balancing the three factors—content, form, and context—the Court finds that the Prior Action was a matter of public concern. "Within this balancing, [the court] weigh[s] context and form 'more heavily." *Id.* (citing *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 2016)). Accordingly, Plaintiffs' filing the Prior Action was a constitutionally protected activity.

Having addressed the first element of Plaintiffs' retaliation claim, the Court will turn to the only element that the parties themselves placed in dispute: a causal connection between the protected conduct and the adverse action. To this point, Helper argues that "Plaintiffs cannot establish that any protected speech was a substantial [or] motivating factor in their termination." (Doc. No. 59 at 23). In response, Plaintiffs argue that they have set forth substantial evidence demonstrating that the Prior Lawsuit, as well as Shane Dunning's lawsuit against Dickson County, were motivating factors "for Helper's decision to falsely *Giglio* impair [Plaintiffs] and cause their termination." (Doc. No. 81 at 32). The Court agrees with Plaintiffs. Plaintiffs have submitted sufficient evidence demonstrating a genuine issue of material fact as to whether Helper's *Giglio*

Email was motivated at least in part as a response to the Prior Action. But this is beside the point because, as discussed above, because Helper's *decision to Giglio impair Plaintiffs* is subject to absolute immunity. The Court must and will consider only whether Plaintiffs have set forth evidence suggesting a causal connection between the protected conduct (the filing of the Prior Action) and Helper's *communication to CM Collins*.[19] And, as discussed below, the Court finds that they have presented sufficient evidence to permit a reasonable jury to find the casual connection element satisfied.

Most notably, Plaintiffs point to deposition testimony from CM Collins that during the October 18 Call (two days before Helper sent the *Giglio* Email) Helper and CM Collins discussed Plaintiffs' Prior Action:

> Q. Okay. So [Helper] was talking to you about the lawsuit that we have – the first lawsuit that we settled in late August?
> A. Yes, sir.
> Q. Okay. What did she say about that?
> A. I don't remember specific. It was more of – the conversation was more of "These are some proposed changes I don't like. These are some historical things that have happened." When I say "historical," I mean in the last 60 days. I'm not talking a global history; I'm talking some things that have gone on with bringing people back to work who have sued, the changes, and just general – general not liking the direction of the Fairview Police Department as she knew it.

(Doc. No. 78-5 at 26:10-24). In addition, CM Collins testified that during the October 18 Call he and Helper did not discuss *Giglio*. (*Id.* at 23:13-14). But according to him, he did tell Helper that "if she had specific concerns about [Stockdale's and Dunning's] performance, she was going to have to submit [to him] something in writing. [He] was not going to be taking any action based on [their October 18, 2016 phone] conversation or what she believed." (*Id.* at 28:10-14). Finally, Helper's *Giglio* Email begins, "Mr. Collins, per our discussion . . ." (Doc. No. 1-12), which

---

[19] CM Collins testified that "[t]he sole reasoning for [Plaintiffs'] termination [was] [the October 20, 2016 email]." (Doc. No. 78-5 at 36:9-11).

suggests that her decision to communicate the *Giglio* impairment to CM Collins was motivated, at least in part, by topics discussed on the call, including the Prior Action.

Based on the evidence, the Court finds that Plaintiffs have sufficiently demonstrated that questions of material fact exist as to whether Helper's *Giglio* Email was sent in retaliation for the Prior Action. Just two days before she sent the email, Helper expressed her displeasure with bringing back to work employees who sued FVPD. Similarly, in *Hudson v. City of Highland Park*, 943 F.3d 792 (6th Cir. Nov. 22, 2019), the Sixth Circuit held that the plaintiff had sufficiently alleged causation where he had shown that his employer had "expressed frustration with his complaints . . . and knew that [the plaintiff] reported [other] firefighters to a government agency for their misbehavior." *Id.* at 6. Although that factor was considered at the motion to dismiss stage, it is still relevant here where Plaintiffs have shown that Helper expressed frustration for their suing the City and that those frustrations were expressed only two days before she sent the *Giglio* Email to CM Collins.

As Helper points out, if a plaintiff "raises an inference that the defendant's conduct was motivated in part by the plaintiff's protected activity, the burden shifts to the defendant to 'demonstrate that it would have been taking the same action in the absence of the protective activity.'" *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371-72 (6th Cir. 2011). Helper argues that the WCSO Report existed in the absence of any protected activity and Helper shared her concerns with CM Collins due to the existence of the WCSO Report. "[Helper's] burden is to show that she actually believed that her duty to report was triggered and that she made this report because of that duty." *Wenk v. O'Reilly*, 783 F.3d 585, 597 (6th Cir. 2015). In support of this argument Helper relies on her own affidavit and her own deposition transcript. She also cites

the deposition transcript of CM Collins, but it is unclear how CM Collins's testimony supports this argument.

Helper's argument that she would have shared her concerns with CM Collins in the absence of Plaintiffs' Prior Action is rebutted by the fact that although Helper received drafts of the WCSO Report on June 6, 2016 and June 21, 2016, she did not publish the *Giglio* Email to CM Collins until October 20, 2016, approximately four months later but: (a) less than three months after the filing of the Prior Lawsuit; (b) a month-and-a-half after the dismissal of the Prior Lawsuit, and (c) only two days after complaining to CM Collins that she was unhappy that FVPD was bringing people back to work who have sued. (Doc. Nos. 82-2 at 26:15-24, 82-8 at 72-73). The *Giglio* Email is temporally connected with the filing (and conclusion) of the Prior Lawsuit substantially more closely than with Helper's receipt of the WCSO Report.

Accordingly, the Court concludes that viewing the evidence most favorable to Plaintiffs, a reasonable jury could conclude that Helper's communication of the *Giglio* impairment to CM Collins was motivated at least in part by Plaintiffs' Prior Action.

Having determined that Plaintiffs have raised a genuine issue as to the existence of retaliation in violation of the First Amendment, the Court must determine whether Plaintiffs' First Amendment right to be free from retaliation for the filing the Prior Action was clearly established such that the qualified immunity defense is inapplicable. *See Harris*, 902 F.3d at 637.

To determine whether a right is "clearly established," courts in this circuit "look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Anderson*, 483 U.S. at 640. However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted.)

"[I]t is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Campbell v. Mack*, 777 F. App'x 122, 136 (6th Cir. 2019) (quoting *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (citing cases)). Although public employees' right to file a petition is limited to matters of public concern, that (limited) right is well-established. As the Supreme Court stated in *Guarnieri*, "[t]he right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process." *Guarnieri*, 564 U.S. at 399. It is clearly established that a public employee has a right to be free from retaliation for filing lawsuits relating to matters of public concern.

Accordingly, Helper's motion for summary judgment as to Plaintiffs' claim of retaliation under the First Amendment for filing the Prior Action will be denied.

IV.     State Law Claims

Helper argues that Plaintiffs have failed to establish intentional interference with employment, defamation, false light invasion of privacy, or official oppression under Tenn. Code Ann. § 39-16-403. Helper also claims that she has absolute official privilege from defamation for statements she made within the scope of her official duties. The Court will review Helper's arguments with respect to each of these claims in turn.

**A.  Tortious Interference with a Business Relationship**

To prevail on a claim for tortious interference with a business relationship under Tennessee law, plaintiffs must demonstrate the following:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

*Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis in original; internal footnotes and citations omitted). In order to satisfy the fourth element, Plaintiffs need only establish one of the two alternative theories— "improper motive" or "improper means." To establish "improper motive . . . the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* at 701 n.5. "Improper means" includes the following:

> means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats of intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* (internal citations omitted).

Helper argues that she is entitled to summary judgment as to Plaintiffs' claim of intentional interference with Plaintiffs' business relationships because she did not interfere with Plaintiffs' employment contract and she did not send her email without justification or with intent to breach any contract. This argument involves the third and fourth elements of Plaintiffs' tortious interference claim. As to whether Helper intended to cause the termination of Plaintiffs' employment with FVPD (the third element), the Court finds that there exists a genuine issue of material fact. In particular, Plaintiffs have submitted evidence suggesting that before Helper sent the *Giglio* Email, CM Collins had told her that he would not "be taking any action" unless she

submitted to him something in writing. (Doc. No. 81-2 at 28). This suggests that Helper sent the email intending to induce CM Collins to "take action" and is sufficient to demonstrate the existence of a question of material fact.

As to whether Helper either had an improper motive or used improper means (the fourth element), Helper asserts that she sent the *Giglo* email to CM Collins because she believed she had a duty to disclose the WCSO Report. However, Plaintiffs have presented evidence sufficient to cast doubt as to whether that was truly Helper's motive. Specifically, Plaintiffs have presented evidence that Helper's actions were taken in retaliation for the Plaintiffs' exercise of their constitutionally protected right (discussed *supra*) and in order to influence staffing decisions in FVPD (Doc. Nos. 1-2; 1-14; *see also* Doc. No. 82-2 at 26).

Helper also argues that this claim should be dismissed because Tennessee law provides a privilege against an intentional interference with a business relationship claim where there is a unity of interest between the interfering party and the breaching party. (Doc. No. 59 at 25). The rationale for this privilege, apparently, is that because a breaching party cannot be liable *in tort* for breaching its own contract, it cannot be liable in tort causing the breach of its own contract, which in turn means that those having a unity of interest with the breaching party also cannot be liable in tort for causing the breach of the contract by interfering with it in furtherance of that unified interest. In support of this argument, Helper cites to *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779 (Tenn. 2000) and *Nelson v. Metric Realty*, No. M2000-03204-COA-R3-CV, 2002 WL 31126649, at *14-16 (Tenn. Ct. App. 2002).[20] Plaintiffs argue that these cases are inapplicable to the facts here. The Court agrees.

---

[20] Helper suggests that *Nelson* also supports the proposition that "a person who interferes with a contract is not always responsible for the resultant injury. When [a] person acts to promote an interest which is equal or superior in social value to that with which he interferes, his actions are

In *Kolstad v. Leehar Distributors, LLC*, No. 18-cv-00060, 2018 WL 6832086 (M.D. Tenn. Dec. 28, 2018) (Richardson, J.), this Court interpreted the unity of interest privilege as set forth in *Waste Conversion Systems. Id.* at \*6. Specifically, this Court declined to extend the unity of interest privilege to a subsidiary interfering with a business relationship of its parent company because "the Tennessee Supreme Court specifically held that '*a parent company is privileged* to interfere in the contractual relations of a wholly-owned subsidiary.'" *Id.* (citing *Waste Conversion Sys.*, 33 S.W.3d at 784 (emphasis added)). This Court held that because a subsidiary does not have the same level of control over a parent company as the parent company does over its subsidiary, it is not afforded the same privilege. *Id.*

In *Nelson*, the Court of Appeals of Tennessee held that advisor defendants, five individuals who were agents or employees of partnerships or corporations that were directly or indirectly general partners of the breaching party, were entitled to a unity of interest privilege. *Nelson*, 2002 WL 31126649 at \*16. Specifically, the court found that the advisors acted within the scope of their employment and in the best interest of the breaching party, which would have suffered disastrous consequences by performing the breached agreement. *Id.*

The facts here are distinguishable from both cases. First, Helper's relationship with FVPD was far more attenuated than that of a subsidiary to a parent company or that of corporate officer or agent to a corporation. Of course, she is not an employee or agent of FVPD, and she (and her

---

said to be privileged or justified." (Doc. No. 59 at 25 (citing *Nelson*, 2002 WL 31126649 at \*14-16 (discussing the Oregon Supreme Court case *Welch v. Bancorp Management Services*, 296 Or. 208, 675 P.2d 172 (Or. 1983)))). But this proposition is taken out of context. Neither *Nelson* nor *Welch* involve a third party interfering with a business relationship. Rather, both cases involve a person, or people, "who, by reason of his position with the corporation, owes a duty of advice and action to the corporation." *Nelson*, 2002 WL 31126649 at \*15 (citing *Welch*, 675 P.2d at 176-77). And the interest of equal or superior in social value is in reference to the greater interest of the corporation induced to breach.

prosecutor's office) is not beholden to FVPD the way a subsidiary is to a parent company. And as the Court held in its MTD Order denying Helper's Motion to Dismiss and as is supported by the record, "Helper, as a prosecutor, has no official role in the employment decisions of the Department, despite the relationship between Department officers and criminal proceedings." (Doc. No. 27 at 14-15; Doc. No. 84 ¶ 3). Moreover, in the same Order the Court also held that "even an officer of a corporation can be liable for interfering with that corporation's employment relationship with an employee where the interference is based on factors outside of his role in the corporation and is motivated, instead, by the corporate officer's own personal interests." (Doc. No. 27 (citing *Lyne v. Price*, No. W2000-00870-COA-R3-CV, 2002 WL 1417177, at *3 (Tenn. Ct. App. June 27, 2002)). As discussed above, Plaintiffs have demonstrated that a genuine dispute exists as to Helper's motivation for: (a) raising concerns about Plaintiffs' returning to work on the October 18 Call between Helper and CM Collins (during which *Giglio* was not discussed); and (b) sending her *Giglio* Email. Construing all reasonable inferences in favor of the nonmoving party, as is required, it appears that Helper's motives in making these communications were not based on an interest that aligned with FVPD but rather based on her own personal motivations as a third party.

Because the Court predicts that the Tennessee Supreme Court would not hold that the unity of interest privilege applies in this case, the Court will not apply the unity of interest privilege here.

Accordingly, Helper's motion for summary judgment as to Plaintiffs' claim for tortious interference with Plaintiffs' employment with FVPD will be denied.[21]

---

[21] In the MTD Order, the Court held that because Helper has absolute immunity for her decision to *Giglio* impair Plaintiffs and because that is the only action underlying Plaintiffs' claim that Helper interfered with prospective employment relationship with other police departments, she is immune from Plaintiffs' claim for tortious interference with prospective employment outside of FVPD. The Court reasserts that finding here. *See Willett v. Ford*, 603 S.W.2d 143, 147 (Tenn. Ct.

## B. Defamation

Helper contends that summary judgment is also warranted as to Plaintiffs' defamation claim because Helper's *Giglio* Email contained no false representation of fact and Plaintiffs cannot show that she acted with actual malice (as is required for defamation claims brought by public officials like Plaintiffs).[22] To establish a prima facie case of defamation under Tennessee law, Plaintiffs must show: (1) that a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). For a statement to be considered defamatory, it must be more than annoying, offensive, or embarrassing to the plaintiff. *Woodruff v. Ohman*, 166 F. App'x 212, 216 (6th Cir. 2006) (citing *Stones River Motors, Inc. v. Mid-South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983)). "Rather, [t]he words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule, and [t]hey must carry with them an element of disgrace." *Id.* (quoting *Stones River*, 651 S.W.2d at 719) (internal quotation marks omitted). A plaintiff who qualifies as a public official or public figure must also prove, with "convincing

---

App. 1979) (holding that absolute prosecutorial immunity extends to state common law claims as well as federal claims under Section 1983).

[22] The Court finds that Plaintiffs, as police officers, are public officials. *See Selby v. Ilabaca*, No. 02A01–9503–CV–00058, 1996 WL 219620, at *4 (Tenn. Ct. App. Apr. 29, 1996); *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 n.2 (Tenn. Ct. App. 1997). Despite Plaintiffs' arguments to the contrary, the Court finds *Selby* instructive and, moreover, concludes that there is sufficient case law in Tennessee and this circuit to support the notion that police officers are public officials. *See Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978) ("Any position of employment which carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen, or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public office within the meaning of the constitutional privilege."); *Lyons v. State*, 1993 WL 414840, at *2 (Tenn. Ct. App. Oct. 20, 1993) (holding a correctional officer is a public official); *Roberts v. Dover*, 525 F. Supp. 987, 989-95 (M.D. Tenn. 1981) (finding that police officers are public officials); *Allen v. City of Jackson*, 981 F. Supp. 2d 738, 747 (W.D. Tenn. 2013) (same).

clarity," that the defamatory statement was "made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (internal quotation marks omitted).[23]

Helper argues that Plaintiffs' defamation claim fails because the *Giglio* Email states only her opinion and therefore does not contain any false representation of fact. Plaintiffs disagree.[24] Plaintiffs argue that the *Giglio* Email "contained a statement of facts regarding the Plaintiffs' credibility and the impeachment of their testimony by virtue of the WCSO IR." (Doc. No. 81 at 36). Plaintiffs also argue that even if the Court finds that the *Giglio* Email did state only an opinion, it is nonetheless actionable because it implied undisclosed defamatory facts as the basis of the opinion. (*Id.*). But the Court disagrees, finding that Plaintiffs have failed to state a plausible claim

---

[23] The upshot of this principle is simply that, with public figures, mere negligence will not suffice to establish the third element of a defamation claim. *See Hibdon*, 195 S.W.3d at 58 (citing *Press, Inc.*, 569 S.W.3d at 442 ("As to a public figure, one can only be held liable if he or she knows that the statement is false and that it defames another person, or if he or she acts in reckless disregard of such matters. As to a private person, he or she may be held liable if he or she knows that the statement is false and that it defames the person, or if he or she acts in reckless disregard of these matters, or acts negligently in failing to ascertain them.").

[24] Plaintiffs argue that Helper's statement that she would have to turn the WCSO Report over to defense counsel in cases in which Plaintiffs were involved is false and that she could not have believed it was true. In other words, Plaintiffs argue that Helper's opinion is false. This type of argument does not support a defamation claim. In *Milkovich*, the Supreme Court explained:

> We note that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement, "I think Jones lied," may be provable as false on two levels. First, the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

*Milkovich*, 497 U.S. at 20 n.7. Accordingly, even if Helper did not believe that she had to turn the WCSO Report over to defense counsel, that would not support Plaintiffs' defamation claim. Instead, the defamation claim depends on the falsity of the facts implied by her statement that she had to had to turn the WCSO Report over to defense counsel—falsity that, as discussed below, is absent here.

for defamation because Helper's *Giglio* Email cannot reasonably be interpreted as asserting or implying any undisclosed or false facts.

First, the *Giglio* Email does not assert any defamatory facts.[25] In the email, Helper states that "[b]ecause of the information contained in [the WCSO Report]," under *Giglio*, her office will be required to turn over the WCSO Report to defense counsel in cases where Plaintiffs are involved and that the Plaintiffs' testimony *may* be impeached without independent corroboration from another law enforcement officer. It is clear that Helper's statement is a subjective opinion as opposed to a verifiable fact.[26] This is supported by Plaintiffs' assertion that their expert witness, Judge David Durham, "*opined* that there is no material evidence or relevant evidence regarding

---

[25] Indeed, arguably the *Giglio* email does not assert *any* facts at all, whether defamatory or not defamatory. At most, it asserts (in its first sentence) the facts that there is a WCSO Report and that it has information in it. But given the structure of the applicable sentence, these facts are probably more properly viewed as implied than as asserted. As for the statement in the second sentence that "[w]ithout independent corroboration from another law enforcement officer and/or independent witness, the testimony of Officers Dunning and/or Stockdale may be impeached" (Doc. No. 1 ¶ 89), it is not a statement of fact. It clear from the speculative language, that the testimony *may* be impeached, that the statement expresses a belief that impeachment possibly could occur—and this kind of belief about what is or is not possible is an *opinion*. The sentence certainly does not assert that a court *should* allow impeachment to occur, but any such assertion would likewise be an opinion in any event. Still less does the sentence assert that impeachment should be allowed to occur *because* any derogatory allegations regarding Plaintiffs set forth in the WCSO Report are (or even likely are) true; thus, the sentence does not include the factual assertion that some or all of those allegations are true. Because the *Giglio* email asserts, at the very most, the undisputed fact that the WCSO Report exists and contains information, the Court herein refers to the *Giglio* Email as asserting no facts. The Court separately discusses below the extent to which the *Giglio* Email *implies* facts.

[26] "The connotation resulting from a statement must be 'sufficiently factual to be susceptible of being proven true or false' in order to be actionable." *Stilts v. Globe Intern., Inc.*, 950 F. Supp. 220, 223 (M.D. Tenn. 1995); *see also Anderson v. Watchtower Bible and Tract Soc. of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *31 n.21 (Tenn. Ct. App. Jan. 19, 2007) ("[S]tatements of opinion [based upon disclosed, nondefamatory facts] are not provable as either true or false."); *Whiting v. Allstate Ins. Co.*, No. 08-12991, 2010 WL 956030 (E.D. Mich. Mar. 15, 2010) (finding that statements that the defendant may have violated company ethics policy was an opinion as to which one could agree or disagree but finding that it could not be classified as true or false).

the Plaintiffs that is contained in the WCSO Investigative Report which would have to be disclosed to a defense attorney." (Doc. No. 81 at 18-19 (emphasis added)).[27] In other words, Judge David Durham's *opinion* that the WCSO Report did not contain *Giglio* material supports the notion that Helper's prior, conflicting statement is also an opinion.

That is not the end of the inquiry, however, because the Supreme Court and Tennessee courts recognize that opinions are not automatically protected by the United States Constitution. *Zius v. Shelton*, No. E1999-01157-COA-R9-CV, 2000 WL 739466, at *2 (Tenn. Ct. App. June 6, 2000) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)). Tennessee courts have adopted the rule promulgated in the Restatement 2d of Torts (and followed by the Supreme Court in *Milkovich*), that "[a statement of opinion] is actionable *only* if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (2d) of Torts § 566 (emphasis added). "[W]here there is no false representation of fact, one may not recover in actions for defamation merely upon the expression of an opinion which is based upon disclosed, nondefamatory facts, no matter how derogatory it may be." *Kersey v. Wilson*, No. M2005-02106-COA-R3CV, 2006 WL 3952899, at *6 (Tenn. Ct. App. Dec. 29, 2006).

Here, Plaintiffs argue that because Helper's *Giglio* Email is based on the WCSO Report, which contains only untruthful defamatory allegations and gossip, the *Giglio* Email "implies the allegation of undisclosed defamatory facts as the basis for the opinion." (Doc. No. 81 at 36). According to Plaintiffs, it is therefore actionable as a defamatory statement. The Court disagrees. First and foremost, where public-official plaintiffs are involved, there can be no liability under

---

[27] In this instance, the Court is not accepting the testimony of Judge David Durham under Fed. R. Evid. 702; the Court currently takes no position on whether this testimony is admissible under Rule 702. The Court is merely recognizing Plaintiffs' characterization of their expert's testimony (on the same subject as the *Giglio* Email) as an opinion.

state defamation law absent a showing of falsity. *Milkovich*, 497 U.S. at 20 n.6. In *Milkovich*, the Supreme Court discussed the controlling case law regarding the constitutional protection afforded to an opinion, including its prior holding in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 766 (1986). Specifically, the Court noted that "*Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 20;[28] s*ee also Raiteri,* 1989 WL 146743 at *4 ("[O]pinions which are based upon fully disclosed facts are not actionable unless the facts are false."); *Hicks v. Metropolitan Gov't of Nashville & Davidson County*, No. 86-49-II, 1986 WL 10885, at *6 (Tenn. Ct. App. Oct. 3, 1986) (holding that liability does not ensue where a statement of opinion is based upon assumed or undisclosed facts that are true).

The requirement of falsity is dispositive here at the summary judgment stage. No reasonable fact finder could conclude that Helper's opinion that she would have to disclose the WCSO Report to defense counsel in cases in which Plaintiffs may testify implies any untrue facts as the basis for the opinion. Based on the obligations of prosecutors under *Giglio* (discussed below), it is clear that Helper's opinion implies only the fact that the WCSO Report *contains* allegations of wrongdoing against Plaintiffs—a fact which is undisputed by Plaintiffs. The *Giglio* Email does not imply the *truthfulness* of those allegations. Indeed, Helper's statement does not in any way suggest that she would be required to disclose the WCSO Report *because* the allegations contained therein were *true* or because Defendants had in fact acted as they were alleged in the

---

[28] Although the Supreme Court reserved judgment on cases involving nonmedia defendants, it noted that "[p]rior to *Hepps*, . . . , where public-official or public-figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result." *Milkovich*, 497 U.S. at 20 n.6.

report to have acted. To assert otherwise is to engage in rank speculation that flies in face of the text of the allegedly defamatory statement considered in the context of *Giglio* and its progeny.

The notion that Helper would be required to turn over the WCSO Report to defense counsel (in cases where Plaintiffs may testify) because it contains allegations against Plaintiffs, whether or not established as true—and thus the notion that Helper was implying only that *allegations had been made* against Plaintiffs—is at least supported by *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio*, and their progeny. "[P]rosecutors [have] a compelling duty to furnish the accused with exculpatory evidence pertaining either to the accused's guilt or innocent or to the potential punishment that may be imposed." *Hutchison v. State*, No. 03C01-9606-CR-00232, 1997 WL 789923, at *6 (Tenn. Crim. App. Dec. 23, 1997) (citing *Brady*, 373 U.S. at 87). Under *Giglio*, evidence that challenges the credibility of a key witness or that would be useful to impeach a witness must also be disclosed. *Giglio*, 405 U.S. at 153-54; *see also Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995) ("The Court has specifically held that evidence impeaching a government witness's credibility may be exculpatory within the meaning of *Brady*."). Indeed, "[t]he prosecution's duty to disclose [*Brady/Giglio* material] is not limited in scope to 'competent evidence' or admissible evidence." § 13:27. Exculpatory evidence—"Brady material", Tn. Criminal Trial Practice § 13:27 (2019-2020 ed.) (citing *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see also People v. Garrett*, 23 N.Y.3d 878, 886 (N.Y. Ct. App. 2014) (holding that allegations against a police officer in a pending civil lawsuit were favorable to a criminal defendant for the impeachment of the officer). Because the duty to disclose is not limited—or at least could reasonably be understood as not limited—to allegations that have been proven to be true (or even merely credible), it is clear that Helper's opinion that she would have to turn over the WCSO

Report does not imply that the underlying allegations in the WCSO Report are true.[29] In short, the *Giglio* Email does not imply derogatory facts about Plaintiff, *i.e.,* it does not imply that alleged derogatory facts about Plaintiffs contained in the WCSO Report *are true* (or even merely credible). What it implies is merely that those derogatory facts have been *alleged*—an implication that is not false.

Second, the *Giglio* Email is not based upon any undisclosed facts. And "[a]s long as the true facts on which the opinion is based are published, the opinion itself it not actionable." *Stones River*, 651 S.W.2d at 722.[30] Indeed, the WCSO Report was published on the City of Fairview website on July 20, 2016 (approximately three months prior to the publication of the *Giglio* Email).

---

[29] The Court pauses to note that it has serious policy concerns regarding the expansion of prosecutors' liability for defamation for communicating, to supervisors at agencies employing law enforcement officers, the fact that officers with the agency are *Giglio* impaired. The Court fears that such expansion could incentivize prosecutors not only to remain reticent about the *Giglio* impairment of officers, but also to avoid *Giglio* impairing officers in the first place. Excessive *Giglio* impairment certainly is undesirable, but on the other hand erring on the side of forgoing *Giglio* impairment is dangerous because it could impair criminal defendants' due process rights protected by *Giglio*. The Court emphasizes, however, that it is not deciding this case on policy grounds, but rather on what it views as the proper application of the law to the pertinent facts.

[30] In *Woodruff v. Ohman*, the Sixth Circuit affirmed the trial court's holding that a professor's statement that "'[[f]or the last 2 and one-half years [his post-doctoral research assistant] has spent on this project, she has not been able to accumulate enough data for a single paper, and is still far from it.'" 166 F. App'x at 216, was defamatory. The Sixth Circuit said, "[i]t is reasonable to interpret this statement as defamatory, because, as the district court stated, '[i]t directly injures [p]laintiff in her profession, by implying that she is unable to perform the scientific work at issue and that she is not a competent scientist.'" *Id.* In affirming the trial court's judgement in favor of the plaintiff's defamation claims, the Sixth Circuit noted that "[a]n individual with [plaintiff's] level of education and achievement would likely be viewed with contempt if she was not able to perform the basic duties of her job, and this is thus clearly related to her professional reputation." *Id.* Here, by contrast Helper's opinion implies only the fact that allegations that implicate Plaintiffs' credibility or character for truthfulness about have been made. Because the underlying fact is true (as no one contests that allegations were made as recounted in the WCSO Report) the Court need not and will not decide whether that fact is also defamatory. *See Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) ("Truth is an absolute defense [] when the defamatory meaning conveyed by the words is true.").

To be considered disclosed rather than undisclosed for purposes of this analysis, the facts upon which the opinion is based need not be disclosed in the allegedly defamatory statement. It is sufficient that the facts were previously disclosed or published. *See Raiteri v. RKO General, Inc.*, 1989 WL 146743, at *4 (Tenn. Ct. App. Dec. 6, 1989) (finding that the defendant's characterization of the plaintiff's previously published article as "biased and unbalanced" was an opinion based upon fully disclosed facts (the article itself)).

Accordingly, because the *Giglio* Email contains only statements of opinion and does not imply the existence of undisclosed, false facts, Helper's motion for summary judgment as to Plaintiffs' defamation claim will be granted.[31]

### C. False Light Invasion of Privacy

Helper argues that she should be granted summary judgment as to Plaintiffs' false light invasion of privacy claim for the same reasons she is entitled to summary judgment for defamation. A claim for defamation often overlaps with a claim for false light invasion of privacy, but the Tennessee Supreme Court has determined that "the differences between the two torts warrant their separate recognition." *West v. Media Gen'l Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001).

---

[31] Helper argues that she is entitled to absolute privilege for claims arising out of statements made within the scope of her official duties. After briefing was completed, Plaintiffs filed a Notice of Filing Supplemental Authority (Doc. No. 132), stating that on November 26, 2019, the Tennessee Court of Appeals held that district attorney's general are not entitled to absolute privilege from defamation claims. *Burns v. State*, No. E201802174COAR9CV, 2019 WL 6341041 (Tenn. Ct. App. Nov. 26, 2019). Helper responded (Doc. No. 133), stating that the State has filed an application for permission to appeal the decision to the Tennessee Supreme Court. At this point, the appellate court's decision has not been overturned and is controlling. Furthermore, Helper has produced no case that grants absolute immunity to a district attorney general. The closest she comes is *Jones v. State*, 426 S.W.3d 50 (Tenn. 2013), in which the court stated that "an absolute privilege is a total immunity granted on the basis of the speaker's position or status." *Id.* at 56-58. That case specifically held that "cabinet-level executive officers" had such an immunity. There is nothing in that case suggesting that the privilege applies to speakers in other positions. Helper provides no basis upon which to expand the privilege beyond high-ranking officials, and the Court will not do so here.

To establish a claim for the false light invasion of privacy, a plaintiff must prove "that a defendant published a matter concerning the plaintiff, placing the plaintiff before the public in a false light which is highly offensive to a reasonable person, and the defendant had knowledge that his statement was false or acted recklessly with regard to the falsity of the publicized statement." *Gard v. Harris*, No. 2008-01939-COA-R3-CV, 2010 WL 844810, at *3 (Tenn. Ct. App. Mar. 11, 2010). As with a defamation claim, where a false light claim is brought by a public official or public figure, the "actual malice" standard applies.

In Tennessee, both "defamation and false light causes of action require a plaintiff to allege that the defaming party communicated a false or misleading statement of fact, or statement of opinion that implies having a basis in defamatory facts." *Seaton v. TripAdvisor, LLC*, No. 3:11–cv–549, 2012 WL 3637394, at *5 (E.D. Tenn. Aug. 22, 2012) (citing *Steele v. Ritz*, No. W2008-02125-COA-R3-CV, 2009 WL 4825183 (Tenn. Ct. App. Dec. 16, 2009)). As discussed above, the statements contained in the *Giglio* Email are opinions and do not imply the existence of undisclosed, false facts.

Accordingly, Helper's motion for summary judgment at to Plaintiffs' claim for false light invasion of privacy will be granted.

### D. Official Oppression Under Tenn. Code Ann. § 39-16-403

With regard to the cause of action for negligence *per se*, Plaintiffs allege that Helper committed official oppression in violation of Tenn. Code Ann. § 39–16–403. Helper moves for summary judgment as to this claim on the basis that the underlying criminal statute does not provide a private right of action. (Doc. No. 59 at 32-33). Plaintiffs argue that Helper misconstrues Plaintiffs' claim. The Court agrees. There is a difference between a claim of "official oppression" under Tenn. Code Ann. § 39–16–403, which is impermissible because the statute does not contain a private right of action, and a claim that Helper's alleged violations of the Tennessee criminal

statute constitutes negligence *per se*. Plaintiffs may bring a claim in this Court of the latter. *See Massey v. Hess*, No. 5-cv-249, 2007 WL 2725890, at *16 (E.D. Tenn. Sept. 17, 2007).

Accordingly, Helper's motion for summary judgment as to Plaintiffs' claim for official oppression under Tenn. Code. Ann. § 39-16-403 will be denied.

V.      Helper's Motion to Strike

Also pending before the Court is Helper's motion (Doc. No. 96) to strike or disregard portions of "Plaintiffs' Responses to Defendant Helper's Corrected Statement of Undisputed Material Facts" (Doc. No. 83) and portions of "Plaintiffs' Statement of Undisputed Facts in Opposition to Defendant Helper's Motion for Summary Judgment" (Doc. No. 81-1). [32] Helper argues that Doc. No. 83 includes material which is inappropriate for a response to a summary judgment movant's statement of undisputed material facts. The Court agrees, and it did not refer to such material in Doc. No. 83 in deciding Helper's motion for summary judgment. As for Doc. No. 81-1, Helper claims that Plaintiffs, in order to demonstrate that particular facts are undisputed, relies on inadmissible hearsay, testimony by witnesses not competent to testify as to the facts at issue, evidence lacking in foundation or appropriate supporting citation, and legal conclusions as fact. The Court agrees that to the extent Plaintiffs relied on such non-competent "evidence," it should not be relied on for any purpose when deciding a summary judgment motion. Thus, the Court did not rely on any non-competent evidence for any purpose in deciding Helper's motion for summary judgment, nor did it consider Plaintiffs' alleged undisputed facts as established facts

---

[32] Regrettably, the very first sentence of Helper's motion incorrectly identifies the document Plaintiffs filed at Doc. No. 81-1—erroneously calling it Plaintiffs' "Responses to General Helper's Statement of Facts"—thus creating for the Court initial confusion as to the nature of the material that Helper sought to strike.

to the extent they were not supported by competent evidence or otherwise shown not to be in genuine dispute.[33] Thus, to this extent, the Court will grant this particular motion.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART AND DENY IN PART** Helper's Motion for Summary Judgment (Doc. No. 58). The Motion will be **GRANTED** as to Plaintiffs' claim for deprivation of due process (Count I), unlawful retaliation for Plaintiffs' exercise of their First Amendment right for speaking to the media (part of Count II), defamation (Counts V & VIII), and false light invasion of privacy (Counts V & IX). These claims will be dismissed. The Motion will be **DENIED** as to Plaintiffs' claims for unlawful retaliation for Plaintiffs' exercise of their First Amendment right for filing the Prior Action (part of Count II), official oppression under Tenn. Code. Ann. § 39-16-403 (Count III), and tortious interference with a business relationship (Count IV).

Helper's Motion to Strike (Doc. No. 96) will be **GRANTED** to the extent the Court considered only those portions of Plaintiffs' responses to Helper's Statement of Facts and Plaintiffs' Statement of Facts that the Court found were appropriate under Fed. R. Civ. P. 56 and/or the local rules of this Court.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[33] Usually, non-movants like Plaintiffs concern themselves with establishing that certain facts *are* in genuine dispute for purposes of the summary judgment motion. Here, Plaintiffs took the opportunity—apparently available given the way the Court's local rules unfortunately read at the time—to assert that certain facts supporting its position as the non-movant were *not* in dispute, even as it contemporaneously took the more common tack of asserting that the allegedly undisputed facts relied on by Helper *were* in dispute.